1   Derek J. Emge (SBN 161105)
2   THE EMGE FIRM, LLP
    501 W. Broadway, Suite 1760
3   San Diego, CA  92101
4   Telephone:   (619) 595-1400
    Facsimile:    (619) 595-1480
5

6   Carrie Brous (KS 18157)
    Tammy L. Horn (KS 15418)
7   BROUS HORN LLC
8   10313 West 140th Street
    The Carriage House
9   Overland Park, KS  66221
    Telephone: (913) 897-7877
10  Facsimile: (913) 982-2515
11

12  ATTORNEYS FOR RELATOR

13                  UNITED STATES DISTRICT COURT

14              SOUTHERN DISTRICT OF CALIFORNIA

15

16  UNITED STATES OF AMERICA *ex*     CASE NO. 14cv2093WQH(NLS)
    *rel.*  [UNDER SEAL]
17
                 Plaintiff,
18                                    **FIRST AMENDED COMPLAINT**
    v.                                **FOR VIOLATIONS OF THE FALSE**
19                                    **CLAIMS ACT**
    [UNDER SEAL]
20                                    **[FILED UNDER SEAL PURSUANT**
                 Defendant.           **TO 31 U.S.C. § 3730]**
21
22                                    **JURY TRIAL DEMANDED**
23

24

25

26

27

28

                                              **14cv2093WQH(NLS)**

**FILED**

SEP 1 6 2015

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel. CINDY V. SALGADO | ) |
| CINDY V. SALGADO, an<br>Individual | ) **CASE NO. 14cv2093WQH(NLS)** |
| STATE OF ARKANSAS<br>ex rel. CINDY V. SALGADO | ) **FILED UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. § 3730** |
| STATE OF CALIFORNIA<br>ex rel. CINDY V. SALGADO | ) |
| STATE OF COLORADO<br>ex rel. CINDY V. SALGADO | ) **DO NOT ENTER<br>ON PACER** |
| STATE OF CONNECTICUT<br>ex rel. CINDY V. SALGADO | ) |
| STATE OF DELAWARE<br>ex rel. CINDY V. SALGADO | ) |
| DISTRICT OF COLUMBIA<br>ex rel. CINDY V. SALGADO | ) |
| STATE OF FLORIDA<br>ex rel. CINDY V. SALGADO | ) |
| STATE OF GEORGIA<br>ex rel. CINDY V. SALGADO | ) |
| STATE OF HAWAII<br>ex rel. CINDY V. SALGADO | ) |
| STATE OF ILLINOIS<br>ex rel. CINDY V. SALGADO | ) |
| STATE OF INDIANA<br>ex rel. CINDY V. SALGADO | ) |
| STATE OF LOUISIANA<br>MEDICAL ASSISTANCE<br>PROGRAMS<br>ex rel. CINDY V. SALGADO | ) |
| STATE OF MARYLAND<br>ex rel. CINDY V. SALGADO | ) |
| STATE OF MASSACHUSETTS<br>ex rel. CINDY V. SALGADO | ) |
| STATE OF MICHIGAN<br>ex rel. CINDY V. SALGADO | ) |

1

STATE OF MINNESOTA
ex rel. CINDY V. SALGADO

STATE OF MONTANA
ex rel. CINDY V. SALGADO

STATE OF NEVADA
ex rel. CINDY V. SALGADO

STATE OF NEW HAMPSHIRE
ex rel. CINDY V. SALGADO

STATE OF NEW JERSEY
ex rel. CINDY V. SALGADO

STATE OF NEW MEXICO
ex rel. CINDY V. SALGADO

STATE OF NEW YORK
ex rel. CINDY V. SALGADO

STATE OF NORTH CAROLINA
ex rel. CINDY V. SALGADO

STATE OF OKLAHOMA
ex rel. CINDY V. SALGADO

STATE OF RHODE ISLAND
ex rel. CINDY V. SALGADO

STATE OF TENNESSEE
ex rel. CINDY V. SALGADO

STATE OF TEXAS
ex rel. CINDY V. SALGADO

STATE OF VIRGINIA
ex rel. CINDY V. SALGADO,

STATE OF WISCONSIN
ex rel. CINDY V. SALGADO

Plaintiffs,

V.

SAGE PRODUCTS, LLC
SERVE:  Registered Agent:
Corporation Service Company
2711 Centerville Road, Ste. 400
Wilmington, DE  19808

Defendant.

2

CASE NO. 11-CV-2975-WQH(JMA)

1

# FIRST AMENDED COMPLAINT

2   Relator Cindy V. Salgado, on behalf of herself and on behalf of Plaintiffs
3   United States of America ("USA"), the State of Arkansas, State of California, State
4   of Colorado, State of Connecticut, State of Delaware, District of Columbia, State
5   of Florida, State of Georgia, State of Hawaii, State of Illinois, State of Indiana,
6   State of Louisiana Medical Assistance Programs, State of Maryland, State of
7   Massachusetts, State of Michigan, State of Minnesota, State of Montana, State of
8   Nevada, State of New Hampshire, State of New Jersey, State of New Mexico, State
9   of New York, State of North Carolina, State of Oklahoma, State of Rhode Island,
10  State of Tennessee, State of Texas, State of Virginia and State of Wisconsin for
11  their First Amended Complaint against defendant Sage Products, LLC
12  ("Defendant" or "Sage Products"), alleges and states as follows:

13

## NATURE OF THE CASE

14  1.   This is a civil fraud action brought on behalf of the United States, 29
15  States and the District of Columbia by a private person known as a *qui tam* relator,
16  or whistleblower, under the federal False Claims Act, 31 U.S.C. § 3729 *et seq.,* as
17  amended, and corresponding state statutes.  Relator also brings this action on
18  behalf of herself for harassment and wrongful termination in violation of the False
19  Claims Act, 31 U.S.C. § 3730(h), California Labor Code §1102.5, as amended, and
20  in violation of public policy under California law.

21  2.   The Relator is a Registered Nurse who held the position of Clinical
22  Science Liaison ("CSL") on the Medical Science Liaison Team at Defendant Sage
23  Products from August 19, 2011, until she was terminated on April 14, 2014.

24  3.   Sage Products is primarily engaged in the development,
25  manufacturing, out-source manufacturing, marketing and sale of pharmaceutical
26  drugs and devices, including prescription and over-the-counter drugs falling under
27  the jurisdiction and regulation of the United States Food and Drug Administration
28  ("FDA").

3

4.      As a CSL, Relator learned that Defendant was off-label marketing its two most profitable drugs:  (1) Pre-surgical 2% chlorhexidine gluconate ("CHG") Cloths ("Pre-Surgical 2% CHG Cloths");  and (2) Prescription Q*Care .12% CHG Oral Rinse ("Rx Q*Care CHG Oral Rinse").

5.      In particular, and as outlined in detail below, Defendant Sage Products is engaged in the following conduct that resulted in the submission of false claims and statements to Medicaid, Medicare, CHIP, TRICARE and other government-funded plans and upon which those plans relied to pay false claims:

    a.      Beginning in at least 2005 and continuing to the present, Sage Products markets its Pre-Surgical 2% CHG Cloths for daily bathing of non-surgical patients and post-surgical patients to prevent hospital-acquired infections, contrary to FDA approval, which is limited to pre-surgical skin preparation, and further directly contrary to the FDA-approved label's explicit warning, "**Do not use**…as a general skin cleanser."

    b.      Beginning in at least 2005 and continuing to the present, Sage Products markets its Pre-Surgical 2% CHG Cloths for daily bathing of the entire body of non-surgical patients and surgical patients before and after surgery to prevent hospital-acquired infections, contrary to the FDA-approved label instructing to cleanse a 5 x 5 inch dry surgical site area or a 2 x 5 inch moist surgical site area of surgical patients and further directly contrary to the FDA-approved label's explicit warning, "**Do not use**…as a general skin cleanser."

    c.      Beginning in at least 2005 and continuing to the present, Sage Products provides "free" Cloth warmers (valued at approximately $2,000 each) so that its customers can warm the Pre-Surgical 2% CHG Cloths for bathing of the entire body and

4

instructs customers to store the Cloths in the warmer at temperatures above the FDA-approved temperatures and also to leave the Cloths in the warmer indefinitely, both thereby causing an increased risk of contamination of the Cloths and an increased risk of infection of the patients.

d.   Beginning in at least 2005 and continuing to the present, Sage Products markets its Rx Q*Care CHG Oral Rinse for the prevention of hospital-acquired pneumonia and ventilator-acquired pneumonia, contrary to FDA approval, which is limited to the treatment of gingivitis by dentists.

e.   Beginning in at least 2005 and continuing to the present, Sage Products markets its Rx Q*Care CHG Oral Rinse to pediatric patients, contrary to the warning on the FDA-approved label that the clinical effectiveness and safety of the Rinse have not been established in children under the age of 18, and contrary to pediatric nursing guidelines that the Rinse should not be used on children under the age of 6.

f.   Beginning in at least 2005 and continuing to the present, Sage Products has paid medical professionals to provide slide presentations to customers, prospective customers, medical professionals, physicians and other medical professionals promoting the off-label uses of Pre-Surgical 2% CHG Cloths and Rx Q*Care Oral Rinse, all with Sage's knowledge and approval, and failed to train those paid speakers on compliance with FDA regulatory requirements for those communications, all in violation of FDA regulations.

g.   Beginning in at least 2005 and continuing to the present, Sage Products pays kickbacks in the form of monetary payments,

5

CASE NO. 11-CV-2975-WQH(JMA)

grant funds, Cloth warmers, per-unit rebates and free products and services to healthcare professionals in exchange for the recommendation, off-label use and off-label prescription of its Pre-Surgical 2% CHG Cloths and Rx Q*Care Oral Rinse.

6.     Sage Products terminated Relator's employment after she resisted engaging in acts outlined in this First Amended Complaint and brought to the attention of Sage Products' senior management and tried to stop the compliance violations outlined in this First Amended Complaint.

7.     This action seeks to recover treble damages and civil penalties and attorneys' fees arising from Defendant's off-label marketing practices and kickbacks that induced false claims to be made to Medicaid, Medicare, CHIP, TRICARE and other government entities in violation of 31 U.S.C. § 3729 *et seq.*, as amended, and corresponding state false claims and whistleblower reward and protection statutes as alleged herein, and for individual claims on behalf of Relator for double lost wages, compensatory and punitive damages and attorneys' fees arising from Defendant's termination of her after she raised complaints to Defendant about its illegal practices described herein.

## JURISDICTION, VENUE AND STATUTORY REQUIREMENTS

8.     This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and corresponding claims under state statutes.  Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a), (b) and 3730(b) and 28 U.S.C. § 1331.

9.     Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10.     Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. §§ 3729 *et seq.* and

6

1 corresponding state statutes and complained of herein took place in part in this
2 district and Defendant transacted business in this district.

3      11.    Pursuant to 31 U.S.C. § 3730(b)(2), the Relator has served with her
4 Complaint to the Attorney General of the United States and the United States
5 Attorney for the District of California, Southern Division, a statement of all
6 material evidence and information currently in her possession and of which she is
7 the original source. This disclosure statement is supported by material evidence
8 known to Relator at the time of filing establishing the existence of Defendant's
9 false claims. Because the statement includes attorney-client communications and
10 work product of Realtor's attorneys, and will be submitted to the Attorney General
11 and to the United States Attorney in their capacity as potential co-counsel in the
12 litigation, the Relator understands this disclosure to be confidential. Relator also
13 will comply with the service requirements of all state false claim and
14 whistleblower reward and protection acts to the fullest extent possible pursuant to
15 31 USC § 3731(3)(c) (as amended by the Fraud Enforcement and Recovery Act of
16 2009, 123 Stat 1617 (May 20, 2009)).

17 **PARTIES**

18      12.    This First Amended Complaint is filed by Relator on behalf of the
19 United States of America, the District of Columbia and the 29 States listed above.

20      13.    The federal Medicaid Program was created in 1965 under Title XIX
21 of the Social Security Act, 42 U.S.C. § 1396 *et seq*. Funding for Medicaid is
22 shared between the federal government and those states participating in the
23 Medicaid program. Federal funds are distributed to the states, which in turn
24 provide certain medical services to certain low-income individuals.

25      14.    Federal Medicaid regulations require each state to designate a single
26 state agency responsible for administering the Medicaid program. The agency
27 must create and implement a "plan for medical assistance" that is consistent with
28 Title XIX and with the regulations of the Secretary of Health and Human Services

7

1    ("the Secretary"). After the Secretary approves the plan submitted by the state, the
2    state is entitled each quarter to be reimbursed for a percentage of its expenditures
3    made in providing specific types of "medical assistance" under the plan. *See* 42
4    U.S.C. § 1396b(a)(1). This reimbursement is called "federal financial
5    participation" ("FFP").

6        15.   The Children's Health Insurance Program ("CHIP"), which was
7    originally enacted in 1997 as part of Title XXI of the Social Security Act, provides
8    health coverage to children and families with incomes too high to qualify for
9    Medicaid, but who cannot afford private coverage. On February 4, 2009, President
10   Obama signed the Children's Health Insurance Program Reauthorization Act of
11   2009 ("CHIPRA"), which reauthorized and provided additional funding for CHIP.

12       16.   In 1965, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et
13   seq., established the Health Insurance for the Aged and Disabled Program,
14   commonly referred to as the Medicare Program (or "Medicare"). Medicare is a 100
15   percent federally-funded health insurance program for qualified individuals aged
16   65 and older, younger people with qualifying disabilities, and people with End
17   Stage Renal Disease (permanent kidney failure requiring dialysis or transplant).

18       17.   The federal TRICARE program provides health benefits to eligible
19   dependents of active duty, retired members of the uniformed services and their
20   eligible dependents, eligible spouses and dependents of deceased members, as well
21   as to TRICARE eligible beneficiaries, in certain circumstances, who are also
22   Medicare eligible. TRICARE is administered by the TRICARE Management
23   Activity ("TMA"). TMA is Department of Defense ("DOD") Field Activity of the
24   Under Secretary of Defense for Personnel and Readiness ("USD (P&R)") to
25   operate under the authority, direction and control of the Assistant Secretary of
26   Defense for Health Affairs ("ASD (HA)"). DOD is an agency and instrumentality
27   of the United States and its TMA/TRICARE activities, operations, and contracts
28   are paid with federal funds. *See* 10 U.S.C. §§ 1071, *et seq.*

18.     The TRICARE program as administered through the TMA/DOD uses contractors to process claims for payment from providers of medical services.

19.     This suit is brought by Relator Cindy Salgado pursuant to § 3730 of the FCA, which allows a person having knowledge of a violation of the FCA to bring an action in federal district court for herself and for the United States and to share in any recovery.  The party is known as a relator and the action that a relator brings is called a *qui tam* action.  *See* 31 U.S.C. § 3730 (b)(1), (d)(1). Relator also brings this suit in her individual capacity for harassment and retaliatory discharge in violation of the Federal False Claims Act, the California Whistleblower Protection Act and California common law.

20.     Relator Cindy V. Salgado, R.N., is an individual residing in the San Diego, California area.

21.     Relator is the original source of the facts and information set forth in this First Amended Complaint concerning the activities of Defendant.  The facts alleged herein are based entirely on her direct, independent knowledge, personal observations and documents in her possession and also on information and belief.

22.     From August 19, 2011, until she was terminated on April 14, 2014, Relator Salgado had been a Clinical Science Liaison ("CSL") on the Sage Products Medical Science Liaison Team. Shortly after bringing the compliance violations outlined in this First Amended Complaint to the attention of senior management at Defendant Sage Products, Sage Products terminated Relator.

23.     Defendant Sage Products, LLC is a pharmaceutical corporation organized and existing under the laws of the State of Delaware with its principal place of business at 3909 Three Oaks Road, Cary, IL 600013.  Relator conducted business on behalf of Sage Products from her home in San Diego, CA 92130.

24.     Sage Products sells healthcare products including products that contain chlorhexidine gluconate ("CHG"), which are a line of drug products regulated by the FDA.  The two products at the heart of this First Amended

9

1    Complaint are Defendant's Pre-Surgical 2% CHG Pre-Surgical Cloths and Rx
2    Q*Care CHG Oral Rinse, which are the two top selling drugs of Defendant.

3         25.    Sage Products was started in 1971 by founders Vince Foglia and Paul
4    Hills (and, shortly thereafter, Paul Hanifl) who sought to develop and manufacture
5    healthcare products. The Company's first product was a mid-stream collection kit.
6    The Company's current focus is on selling products marketed off label to prevent
7    adverse hospital-acquired events such as hospital-acquired pneumonia, ventilator-
8    associated pneumonia, surgical site infections and other hospital-acquired
9    infections.

10        26.    Sage Products is a privately-held corporation with approximately 800
11   employees and is headquartered in Cary, Illinois, but has offices and Sales
12   Representatives throughout the United States and countries around the world.
13   Internationally, Sage Products is known as Comfort Personal Cleansing Products.

14        27.    In November 2012 Sage Products was acquired by investment firm
15   Madison Dearborn Partners out of Chicago.

16        28.    As of November 25, 2013, Sage Products had $300 million in net
17   sales, the majority of which were Rx Q*Care Oral Rinse and Pre-Operative 2%
18   CHG Cloths.

19                     **STATUTORY FRAMEWORK**

20

21       **A. <u>The False Claims Act</u>**

22        29.    The FCA was originally enacted in 1863 during the Civil War to
23   redress fraud in government military contracts; the False Claims Act now is the
24   United States' primary tool to combat fraud against the government. As amended,
25   the FCA provides that any person who, in reckless disregard or deliberate
26   ignorance of the truth, or with actual knowledge, submits a false or fraudulent
27   claim to the United States for payment or approval, or knowingly makes a false
28   record or statement to get a false or fraudulent claim paid or approved by the

1  United States, is liable for a civil penalty plus three times the amount of the

2  damages sustained by the United States because of the false claim. *See* 31 U.S.C.

3  § 3729.

4      **B. The Food, Drug & Cosmetic Act**

5      30.    The Food, Drug, and Cosmetic Act (the "FDCA"), 21 U.S.C. §§ 301-

6  395, governs the manufacture, labeling, and distribution of drugs, including

7  prescription drugs, in interstate commerce.

8      31.    Under the FDCA, a "new drug" cannot be distributed in interstate

9  commerce unless the person who seeks to distribute the drug demonstrates to the

10  satisfaction of the FDA that the drug is safe and effective for each of its intended

11  uses, and there is in effect for such drug an approval of a new drug application

12  ("NDA") pursuant to 21 U.S.C. § 355 (b), or an abbreviated new drug application

13  ("ANDA") pursuant to 21 U.S.C. § 355(j), or an investigational new drug ("IND")

14  submission pursuant to 21 U.S.C. § 355(i). *See* 21 U.S.C. §§ 355(a), (d), 331(d).

15      32.    While physicians may prescribe approved drugs for off-label uses and

16  health-care professionals may use drugs off label, drug manufacturers are

17  prohibited from marketing or promoting a drug for a use that the FDA has not

18  approved.

19      33.    The FDCA also prohibits the distribution in interstate commerce of

20  misbranded drugs. *See* 21 U.S.C. § 331(a) (prohibiting the introduction, delivery

21  for introduction, or causing the introduction or delivery for introduction into

22  interstate commerce of any drug that is misbranded); 21 U.S.C. § 331(c)

23  (prohibiting the receipt in interstate commerce, or causing the receipt in interstate

24  commerce of any drug that is misbranded, and the delivery or proffered delivery

25  thereof for pay or otherwise); and 21 U.S.C. § 331(k) (prohibiting the doing of any

26  act, or causing any act to be done with respect to a drug if such act results in the

27  drug being misbranded).

28

34.   Under the FDCA, "drugs" are defined as, among other things, articles intended for use in the cure, mitigation, treatment or prevention of disease in man; articles intended to affect the structure or function of the body of man; and articles intended for use as components of drugs "as defined in this paragraph." 21 U.S.C. § 321 (g)(1)(B)-(D).

35.   A drug is misbranded under the FDCA if, among other things: its labeling was false or misleading in any particular way, *see* 21 U.S.C. 352(a); the labeling on the drug did not bear adequate directions for use, *see* 21 U.S.C. § 352 (f)(1); and the labeling on the drug did not bear such adequate warnings against use in those pathological conditions, and by children where its use may be dangerous to health, and against unsafe dosage and methods and duration of administration and application, in such manner and form, as were necessary for the protection of users, *see* 21 U.S.C. § 352 (f)(2).

36.   The term "label" is defined in the FDCA as a display of written, printed or graphic matter upon the immediate container of any article. *See* 21 U.S.C. § 321 (k). The term "labeling" is defined in the FDCA as all labels and other printed or graphic matter (a) upon any article or any of its containers or wrappers, or (b) accompanying such article. *See* 21 U.S.C. § 321(m). Labeling is given a broad meaning under the FDCA to include printed or graphic matter that does not physically accompany the shipment of the drug.

37.   Under regulations implementing the FDCA, the term "labeling" is further defined to include, among other items, brochures, booklets, mailing pieces, detailing pieces, letters and similar pieces of printed visual matter descriptive of a drug and references published (for example, the "Physician's Desk Reference") for use by medical practitioners, pharmacists or nurses, containing drug information supplied by the manufacturer, packer, or distributor of the drug and which are disseminated by or on behalf of the manufacturer, packer or distributor. *See* 21 C.F.R. § 202.1(l)(1)(2).

38.     Company websites also constitute labeling as defined in 21 U.S.C. § 321(m) of the FDCA and 21 C.F.R. § 202, and are considered promotional. Website representations and suggestions that are false and misleading within the meaning of 21 U.S.C. § 352(a) are also considered violative advertising.

39.     "Adequate directions for use" is defined by regulation to mean "directions under which the layman can use a drug safely and for the purposes for which it is intended." 21 C.F.R. § 201.5.  The "intended use" of a drug refers "to the objective intent of the persons legally responsible for the labeling of drugs." 21 C.F.R. § 201.128.  "The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article[,]" and "may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives." *Id.*

## C. The Medicaid Drug Program, Medicare and Children's Health Insurance Program ("CHIP")

40.     Medicaid provides reimbursement for the cost of certain drugs for beneficiaries. *See* 42 U.S.C. § 1396b(a); § 1396d(a)(12); § 1396d(b).  States participating in the Medicaid program adopt a state plan that specifies the categories of individuals who will receive medical assistance, the types of medical services that will be covered and the payment rates for such services. *See* 42 U.S.C. § 1396a.

41.     Reimbursement under Medicaid and Medicare is not available for drugs that are "used for a medical indication which is not a medically accepted indication." 42 U.S.C. §§ 1396b(i)(10), 1396d(a), 1396r-8(k)(6), 1395x(t)(1); *see also* §§1927(k)(6), 1860D-2(e)(1)(B) of the FDCA.  A medically accepted indication is a use that "is approved under the Federal Food Drug and Cosmetic Act" or that is included in specified drug compendia. *Id.* § 1396r-8(k)(6). *See also id.* § 1396r-8(g)(1)(B)(i) (identifying compendia to be consulted). Defendant knew or should have known of the passage of these statutes and the statutory limitations

13

found therein on government reimbursement for drugs.   In addition, upon information and belief, Defendant has entered into Medicaid and Medicare Rebate Agreements and other contracts with the United States that specifically informed Defendant what constituted covered drugs under government-funded plans and notified Defendant that drugs that were not used for a medically accepted use were not covered drugs.

42.   In accordance with its Medicaid plan or policy, a state will not knowingly provide reimbursement for drugs resulting from the promotion of off-label orders or misbranding. The same is true for Medicare in that the federal government will not knowingly provide reimbursement for drugs resulting from the promotion of off-label orders or misbranding.

43.   Like Medicaid, CHIP is administered by the states but is jointly funded by the federal government and states and provides reimbursement for, among other things, drugs that are used for uses approved by the FDA or included in specified drug compendia.

**D. TRICARE Drug Program**

44.   TRICARE generally does not pay for off-label uses of drugs. *See* 32 C.F.R.   §   199.4(g)(15).   Under certain circumstances, *see* 32 C.F.R. §199.4(g)(15)(i)(A),   drugs used for off-label indications prescribed by an individual physician may be reimbursed.  TRICARE will not knowingly provide such reimbursement, however, if the drugs result from illegal off-label promotions of orders or prescriptions.

45.   Defendant's illegal off-label and kickback activities described in detail below caused hospitals, physicians and other healthcare providers to order and prescribe Pre-Surgical 2% CHG Cloths and Rx Q*Care CHG Rinse and charges from those orders and prescriptions were submitted to Medicaid, Medicare CHIP, TRICARE and other government-funded plans for reimbursement.

# SPECIFIC FACTUAL ALLEGATIONS

### A. Defendant's FDA Approval and Illegal Off-Label Marketing of Its Pre-Surgical 2% CHG Cloths for Daily Bathing and for Bathing the Entire Body

46.    From at least 2005 and continuing to the present, Defendant illegally markets its Pre-Surgical 2% CHG Cloths off label in three different ways: (1) for daily bathing; (2) for bathing the entire body; and (3) for use at temperatures well above those approved by the FDA.

#### (i)    For Daily Bathing

47.    The FDA-approved use for Defendant's Pre-Surgical 2% CHG Cloths is "for the preparation of skin *prior to surgery*" to help "reduce bacteria that can potentially cause infection." (Emphasis added.)

48.    On January 22, 2009, the FDA issued a warning letter to Sage for good manufacturing practices violations for the Pre-Surgical 2% CHG Cloths. Specifically, there was a harmful bacteria – *Burkholderia cepacia* – in the CHG Cloths that Sage was manufacturing and selling that was making patients sick and, in some cases, critically ill.  The FDA also reminded Sage that this was a *repeat violation* and that "this product is approved for use in surgical settings as a Pre-Surgical skin preparation.  Specifically, this product is indicated for the preparation of skin prior to surgery."

49.    The FDA-approved label further states under **"Warnings" "Do not use** …as a general skin cleanser."  (Emphasis in original.)

50.    Under applicable statutes and regulations, the seller or manufacturer of a drug regulated by the FDA may not promote or market the use of the drug for purposes or in a manner other than those approved by the FDA.

51.    The use of a drug for a purpose other than those approved by the FDA is referred to as "off-label" use.

15

52.   The promotion or marketing by a drug company of "off-label" uses of FDA-regulated drugs is strictly illegal and contrary to the explicit policies and regulations of the United States Government and the FDA.

53.   Despite the FDA-approved label (and January 2009 warning letter), since at least 2005 and continuing to the present, Defendant has been marketing and continues to aggressively market its Pre-Surgical 2% CHG Cloths for *daily bathing* to prevent hospital-acquired infections, which is not limited to pre-surgical skin preparation and which is contrary to the explicit warning on the label *not* to use the Cloths for general skin cleansing.   This off-label marketing goes well beyond and is contrary to the FDA-approved use in that is general skin cleansing and is not aimed at pre-surgical skin preparation at all, but, rather, is an attempt to sell the cloths for infection prevention that includes both the bathing of patients every day *after* surgery and the bathing of patients every day who have not had and will not have surgery at all.

54.   The Pre-Surgical 2% CHG Cloths are relatively expensive, ranging from $5-$10 for each bath.   Bathing with soap and water is approximately $1.50/bath.

55.   Selling the Pre-Surgical 2% CHG Cloths for daily bathing is much more profitable for Defendant than selling on label for the FDA-approved (and much more limited) use of Pre-Surgical skin preparation, which is limited to use prior to surgery. The off-label sales involve using much more product on patients because it is used on a daily basis as a general skin cleanser and also involves using the product on many more patients than just those having surgery.

(ii)   For Bathing the Entire Body

56.   The FDA-approved label includes the following limitations in the directions for use: "**dry surgical sites** (such as abdomen or arm) use one cloth to cleanse such $161cm^2$ area (approximately 5 x 5 inches) of skin to be prepared.

16

Vigorously scrub skin back and forth for 3 minutes, completely wetting treatment area, then discard." (Emphasis in original.)

57.     The only other FDA-approved directions for use is as follows: "**moist surgical sites** (such as inguinal fold) use one cloth to cleanse each 65 cm$^2$ (approximately 2 x 5 inches) of skin to be prepared. Vigorously scrub skin back and forth for 3 minutes, completely wetting treatment area, then discard." (Emphasis in original.)

58.     Despite the FDA-approved label, since 2005 and continuing to the present, Defendant has been and continues to aggressively off-label market its Pre-Surgical 2% CHG Cloths for bathing of the patient's *entire body* to prevent hospital-acquired infections, contrary to the FDA-approved label instructing to cleanse a 5 x 5 inch dry surgical site area or a 2 x 5 inch moist surgical site area for Pre-Surgical skin preparation and contrary to the FDA-approved label's explicit warning not to use the Cloths as a general skin cleanser.

59.     Like daily bathing, selling the Cloths for bathing the entire body (as opposed to the FDA-approved use on a much smaller surgical site area) is much more profitable for Defendant because Defendant can sell more product if the use is on the entire body.

60.     Moreover, from approximately 2005 and continuing to the present, Defendant's sales force has been telling all of its customers to "ignore the [FDA] label" and instead use the off-label daily bathing instructions (referred to here as the "Off-Label Daily Bathing Instructions") handed out by the Sales Representatives as part of their off-label marketing of the cloths for daily bathing of the entire body.

61.     By way of example, such customers include but are by no means limited to all hospitals in the Kaiser Permanente system in California and 7 other states, all hospitals in the Banner Health System in California and 6 other states, UCLA Medical Center, UC Irvine Medical Center, UC Riverside Medical Center,

17

UC San Diego, UC San Francisco Medical Center, VA Hospital in San Diego, University of Arizona Medical Center, St. Luke's Health System (in Kansas City) and the transitional and rehabilitative care hospitals in the Kindred Healthcare System across the country (over 2,000 facilities).

62.    The Off-Label Daily Bathing Instructions instruct the healthcare provider as follows on how to bathe the *entire body*:

> **1**   Wipe your **neck and chest.**
>
> **2**   Wipe **both arms,** starting each with the shoulder and ending at fingertips. *Be sure to thoroughly wipe the arm pit areas.*
>
> **3**   Wipe your **right and left hip** followed by your **groin.** Be sure to wipe folds in the abdominal and groin areas.
>
> **4**   Wipe **both legs,** starting at the thigh and ending at the toes. *Be sure to thoroughly wipe behind your knees.*
>
> **5**   Wipe your **back** starting at the base of your neck and ending at your waist line.   Cover as much area as possible.  Assistance may be required.
>
> **6**   Wipe the **buttocks.**

(Emphasis in original.)

63.    The numbers on Sage's Off-Label Daily Bathing Instructions correspond to numbers on the **"Front"** and **"Back"** of an outline of a human body.

64.    The numbers on Sage's Off-Label Daily Bathing Instructions also correspond to specific CHG Cloths in the Pre-Surgical 2% CHG Cloth package.

65.    The Off-Label Daily Bathing Instructions that Sage gives its customers instruct the customers to do exactly what the FDA-approval label warns not to do – use as a daily skin cleanser.

66.    Nor do the Off-Label Daily Bathing Instructions provide other important warnings from the FDA-approved label such as the warning not to use

18

1    on open skin wounds or on premature or low birthweight infants or on children
2    under 2 months of age.

3        67.    Executives including Defendant's Vice President of Regulatory
4    Affairs and Quality Assurance ("RA/QA") Sean Haley, Defendant's Director -
5    Medical Science Liaison Ron Chappuis (who was formerly the Product Manager of
6    the Pre-Surgical 2% CHG Cloths) and Defendant's Director - Medical Science
7    Liaison Joyce Ryan all told Relator that before the Medical Science Liaison or
8    "Off-Label Team" was created in 2008, Defendant's Sales Representatives freely
9    sold the Pre-Surgical Cloths off label for "daily bathing," including post-operative
10   bathing and bathing patients who were not having surgery – and did so with huge
11   success.

12       68.    As outlined below, even after the Off-Label Team was established in
13   2008, Defendant's Sales Representatives and Regional Sales Managers continue to
14   engage in illegal and aggressive off-label marketing of the Pre-Surgical 2% CHG
15   Cloths for daily bathing on a hospital-wide basis to prevent hospital-acquired
16   infections (without regard for pre-surgical skin preparation or surgical site
17   limitations).

18       (iii)   For Use at Temperatures Well Above Those Approved by the
19       FDA

20       69.    Because patients whose entire bodies are bathed with the CHG Cloths
21   frequently complain that they are cold and uncomfortable, and to encourage
22   customers to continue using the cloths for daily bathing of their patients' entire
23   bodies, Sage instructs its customers to ignore the temperature restriction on the
24   label and warm the Cloths to temperatures well above those approved by the FDA.

25       70.    The FDA-approved label instructs consumers to store Pre-Surgical 2%
26   CHG Cloths at temperatures between 68-77°F and to avoid excessive heat above
27   104°F.

28

CASE NO. 11-CV-2975-WQH(JMA)

71.    Since at least 2005 and continuing to the present, Defendant provides customers with a "free" warmer (valued at approximately $2,000 each), and Defendant's Sales Representatives instruct customers keep the Cloths warmed indefinitely and to disregard the warning to discard the Cloths after they have been warmed for 84 hours.  Sales Representatives also instruct customers to keep the Cloths heated at 125°F for indefinite amounts of time, all contrary to the Cloths' label and contrary to the FDA warning in 2013 that, to reduce the risk of infection from bacteria such as *Burkholderia cepacia*, pharmaceutical companies and customers should ensure that products containing CHG are used according to the directions on the label.   Defendant's promotion of off-label orders actually increases the risk of contamination of the Cloths and infection to patients (as described below).

**B. Defendant's FDA Approval and Illegal Off-Label Marketing of Its Rx Q*Care CHG Oral Rinse for The Prevention of Pneumonia**

72.    Sage Products also sells an oral rinse containing CHG 0.12% that is available only with a prescription.

73.    In February 2011, Sage Products partnered with 3M to include 3M's Peridex™ (Chlorhexidine Gluconate 0.12%) oral rinse in its oral care system. Upon information and belief, prior to 2011, Sage manufactured its own .12% CHG oral rinse for the system.

74.    From 2011 to the present, the oral rinse is sold by Sage Products in a ready to use, single-unit dose as part of a "Continue Care™" oral cleansing and suctioning system called "Q*Care® Rx Oral Cleansing and Suctioning System with 3M™ Peridex™ (Chlorhexidine Gluconate 0.12%) Oral Rinse."   The components of that system include a yankauer, a suction toothbrush, a suction swab and a bottle of 3M™ Peridex™ (Chlorhexidine Gluconate 0.12%) oral rinse.

75.    Defendant's prescription CHG oral rinse is referred to in this First Amended Complaint as "Rx Q*Care CHG Oral Rinse."

76.    Defendant markets its Rx Q*Care CHG Oral Rinse off label, specifically to prevent healthcare-acquired pneumonias (HAPs) including ventilator-associated pneumonia (VAP).

77.    The FDA has approved the Rx Q*Care CHG Oral Rinse only "for uses between dental visits as part of a professional program for the treatment of gingivitis as characterized by redness and swelling of the gingivae."

78.    The FDA has never approved Rx Q*Care CHG Oral Rinse for the prevention of pneumonia, HAPs or VAPs.

79.    Beginning in at least 2005 and, upon information and belief, even earlier and continuing to the present, Sage Products has been illegally marketing Rx Q*Care CHG Oral Rinse to hospitals, pediatric hospitals, acute care hospitals, residential facilities (including long-term care facilities and skilled nursing facilities), surgery centers, doctors, nurses, respiratory therapists, physical therapists and occupational therapists for the off-label use of the prevention of HAPs and VAPs.

80.    Gingivitis is not a condition that is generally treated in hospitals or resident-care facilities.

81.    The dental community is not and has never been a call point for Defendant's Sales Representatives, and Defendant has no real relationships within the dental community.   Instead, Defendant's customer focus is on hospitals, including pediatric hospitals.

82.    Defendant has no customers for CHG Oral Rinse that are dentists, dentist offices or dentist groups.

83.    One hundred percent of Defendant's sales for CHG Oral Rinse are off label, as no hospital or resident care facility would be purchasing the Rinse for the only FDA-approved use − "for uses between dental visits as part of a professional program for the treatment of gingivitis as characterized by redness and swelling of the gingivae."

21

84.   Rather, the hospitals, pediatric hospitals and resident-care facilities are being marketed by Defendant to prescribe and purchase CHG Oral Rinse for the prevention of pneumonia.

85.   Moreover, and as outlined in more detail below, Defendant is targeting pediatric hospitals with its off-label promotion of the CHG Oral Rinse, despite the warning on the FDA label that states: "PEDIATRIC USE: Clinical effectiveness and safety of Peridex™ Oral Rinse have not been established in children under the age of 18" and despite pediatric nursing guidelines published in Pediatric Nursing, March-April 2010/Vol. 36/No.2 at p. 91, that CHG 0.12% Oral Rinse should not be used at all on children under the age of 6.

86.   Even after the Off-Label Team was formed in 2008 (as described below), Defendant's Sales Representatives continue to illegally sell CHG Oral Rinse off label and do not use the Off-Label Team in any manner in connection with this product.

## C.   Defendant's Creation of an "Off-Label Team" in 2008

87.   In 2008, Defendant created a "Medical Science Liaison Team" (referred to within Sage as the "MSL Team" and referred to in discussions with customers as the "Off-Label Team"), of which Relator was a part as a CSL to try and bring its marketing and sales practices into compliance with FDA regulations concerning off-label marketing of its drug products.

88.   The Off-Label Team consisted of CSLs like Relator who had medical backgrounds and who were supposed to respond only to *unsolicited* requests for off-label information by customers with fair and balanced information.

89.   The CSLs on the Off-Label Team, including Relator, initially reported to Ronald Chappuis, whose title was "Director - Medical Science Liaison." Director Chappuis had no medical background and had been the CHG Cloth Product Manager out of the Defendant's Marketing Department.

90.     In approximately April 2012, Chappuis was demoted and Joyce Ryan, R.N., became Defendant's new Director - Medical Science Liaison.  Director Ryan had previously been a CSL for the East Coast territory.

91.     From 2011 to 2014 when Relator worked at Sage Products, the Off-Label Team grew in relation to sales growth to eventually consist of five CSLs to cover the United States.

92.     Relator's CSL territory consisted of the West Coast, which included California, Oregon, Washington, Idaho, Nevada, Utah, Arizona, New Mexico, Wyoming and Montana.  The four other CSLs covered the rest of the country.

93.     Under FDA rules and regulations, such "Off-Label Teams" are appropriate only if certain conditions are strictly adhered to:  (1) the requests for off-label information are *unsolicited* – that is to say, the customer (and not the Sales Representative or any individual employed or paid by Defendant) must request information about off-label uses; and (2) the members of the Off-Label Team are not marketing or selling the drug when contacted by the customer, but, rather, are giving a fair and balanced representation of the off-label uses of the product (including any associated risks).

23

**D. Defendant's Continued Illegal Off-Label Marketing of Its Pre-Surgical 2% CHG Cloths for Daily Bathing, for Bathing the Entire Body to Prevent Hospital-Acquired Infections and for Use at Temperatures Well Above Those Approved by the FDA.**

94.     As noted above, before the Off-Label Team was created in 2008, Defendant's Sales Representatives were selling its CHG Cloths off label for daily bathing, for bathing the entire body and for use at temperatures well above those approved by the FDA, all in contradiction of the FDA label.  This added to the difficultly in compliance with FDA regulations after the Off-Label Team was created in 2008 because the Sales Representatives had been enjoying huge success selling the Cloths off label for several years.

95.     Shortly after she started, it was clear to Relator that Defendant continues to fail to abide by FDA regulations concerning the off-label marketing of Defendant's Pre-Surgical 2% CHG Cloths and that Defendant Executives including Vice President Hadley, former Director Chappuis and current Director Ryan have knowledge of the off-label marketing and fail and refuse to stop it. Moreover, as outlined below, Directors Chappuis and Ryan have participated in the off-label marketing.

96.     As noted above, selling the Pre-Surgical 2% CHG Cloths for daily bathing on a hospital-wide basis was much more profitable to Defendant and Defendant's Sales Representatives than selling on label for the FDA-approved (and much more limited) use of Pre-Surgical cleansing, which was limited to one use prior to surgery on the surgical site.  Accordingly, Relator was blatantly asked and pressured by Regional Sales Managers and Sales Representatives to sell off label for daily bathing on a hospital-wide basis directly to customers and at meetings that included potential customers.

97.     For    example,    on    numerous    occasions,    Defendant's    Sales Representatives would tell Relator and other CSLs that customers had requested off-label information when they had not.  This would induce Relator and the other

CSLs to make solicited contacts with customers (a practice strictly prohibited by FDA rules and regulations) to discuss daily bathing.

98.  Throughout her tenure at Sage from 2011 until she was terminated in April 2014, Relator would receive on average 5 to 15 requests per week to contact a customer that allegedly had an unsolicited request for off-label information.

99.  Relator learned that several of these requests were improper and that the customer had not requested any off-label information.  Rather, it was the Sage Sales Representative who had initiated the request in an effort to start an off-label conversation between Relator and Sage customers.

100.  On several occasions, Relator was told by the customer or prospective customer (via telephone or e-mail) that they had not requested any off-label information and did not know why Relator would be calling them.

101.  Despite the customers' initial confusion by Relator's call, Relator and the customer or potential customer would then engage in an off-label discussion of daily bathing for patients throughout the hospital and Relator would send the customer off-label literature, including versions of the Off-Label Daily Bathing Instructions that include the instruction to use the Pre-Surgical 2% CHG Cloths for "ALL bathing needs for the **entire ICU stay**." (Emphasis in original.)

102.  Relator quickly learned that Defendant's Sales Representatives routinely put in fraudulent CSL requests (via phone calls or e-mails or the Company's salesforce.com database) so that that they (the CSLs) would solicit customers who had not requested any off-label information.

103.  Relator reported this to her Director, Chappuis, and later to her Director, Ryan, but nothing was done.  In fact, Director Ryan told Relator that it was common practice and happened all of the time, both when she (Ryan) was a CSL for the East Coast Territory and now when she (Ryan) was Director.

104.  On other occasions, the Sales Representatives would not even mask the fact that the off-label contact was solicited and that they expected the CSL to

25

promote off-label orders.  For example, on or about July 31, 2013, Senior Sales Representative David Morse called Relator and told her that it would be "huge" for him and his commission if Banner Thunderbird Samaritan Arizona purchased the Pre-Surgical Cloths "for daily bathing" of the entire body. Morse further said to Relator, "This would be huge for me.  I need you to do whatever it takes – pay them a live visit, whatever you can do.  I expect that you call me to let me know what is going on with this account as soon as you know anything."

105.  Feeling pressure from Morse, Relator did as he asked and called Banner Thunderbird Samaritan Arizona and supported Morse's off-label daily bathing promotion.

106.  Approximately 10 months prior to this call, Morse had put in a request for Relator to call the same customer through salesforce.com.  Relator called and left a voice-mail and e-mailed the customer but never heard back, indicating that the sales representative had fraudulently created a CSL request through salesforce.com and induced solicited off-label contact with a customer, as described above.

107.  Another example is on September 20, 2013, when Morse e-mailed Relator and asked her to call Clinical Nurse Specialist Kara Snyder who was part of the Surgical Trauma Critical Care at the University of Arizona Medical Center to follow up on a discussion Morse had had with Snyder about daily bathing.

108.  As part of his request, Morse forwarded a September 19, 2013 e-mail from Snyder to Morse, which documents Morse's promotion of off-label orders with Snyder prior to Relator's involvement.  The e-mail from Snyder to Morse reads, "The PICU [Pediatric Intensive Care Unit] will be starting CHG baths for many of their patients.  They are focusing on patients with central lines (we think)."

109.  Realtor had previously reached out to this same customer in March 2012 at Morse's request (internal Sage tracking case number 1569), but the

26

customer never replied, indicating that Morse had made another fraudulent CSL request. In September 2013, again Relator did as Morse asked and contacted Snyder. This time Snyder took Relator's call and Relator told Snyder about the benefits of using Defendant's Pre-Surgical 2% CHG Cloths for daily bathing, which supported Morse's promotion of off-label daily bathing orders.

110. Another example of solicited contact for off-label orders occurred on several occasions when Sage Vice President of Sales David Haggness asked Shelly Diane, his customer contact at the University of California San Francisco Medical Center ("UCSF"), if she (Diane) would be open to speaking with Relator. Haggness would then have Relator call Diane to discuss the benefits of daily bathing.

111. This improper promotion of off-label orders was profitable for Defendant. For example, according to Sage Sales Representative Kyle Mowry, as of November 27-29, 2012, the Pre-Surgical 2% CHG Cloth sales for UCSF totaled over $300,000/year. Almost all of these sales were for hospital-wide off-label daily bathing for the prevention of infection.

112. In addition to these specific customers given as an example above, Internal Sage Products' documents, including documents from Defendant's "salesforce.com" database as well as archived e-mails from Relator's e-mail address (CSalgado@sageproducts.com), will identify the numerous other specific customers that were subject to these off-label sales tactics by Defendant's Sales Representatives improperly using Relator to off-label market the Cloths.

113. In addition, Relator could tell that the Sales Representative Bryan Hardy had already promoted off-label cloth orders when she talked to customer Mamta Desai (Director of Infection Control, Pomona Valley Hospital Medical Center, Pomona, CA) who awkwardly made it a point to tell Relator that Hardy did not give her (Desai) anything off label. Relator had the same experience when she contacted Cecilia Donohoe (Director of Infection Control at federal customer

27

Madigan Army Medical Center, Tacoma, WA) who awkwardly volunteered to Relator that Jef Malpass did not give her (Donohoe) anything off label, signaling to Relator that both Sales Representatives had given the customers off-label information and instructed the customers to tell Relator that they (the Sales Representatives) had not.

114.   In addition, Relator learned that Defendant used her predecessor, Christian Winkle, and other CSLs like Laura Syvrud to promote CHG Cloth off-label orders.

115.   Sales Representatives Jeremy Merriman and Bryan Hardy made improper off-label requests of Relator such as asking her to go to bigger customers who were not yet using hospital-wide daily bathing and give those customers off-label literature and sell daily bathing for them.  Merriman and Hardy reported to Regional Sales Manager Todd Kieling in the West Coast Territory who, as outlined below, also made improper off-label requests of Relator.  When Relator would question or resist these improper requests, Merriman and Hardy would remind Relator of "the way" her predecessor, CSL Christian Winkle, did things in the West Coast territory before her, meaning that CSL Winkle would do the off-label violations that the Sales Representatives were demanding of Relator.

116.   The improper off-label practices of CSL Winkle also were confirmed by customers.  For example, as a CSL who was obligated to provide fair and balanced information, Relator was prohibited from training customers on off-label uses.  When UCLA Medical Center wanted Relator to come in and do a shift-to-shift in-service training of its staff on daily bathing and Relator resisted, Sandy Friend at UCLA said she did not understand why Sage's practice had changed and asked Relator why she could not just do the off-label training like her predecessor Winkle and Sales Representative Merriman had done.

117.   Although Colorado was also part of Relator's West Coast Territory, Relator was not allowed to cover Colorado.  Instead, CSL Laura Syvrud from

Defendant's Central Territory covered Colorado, even though it was outside of her territory. When Relator voiced concerns to Director Chappuis and later to Director Ryan about why she was not allowed to cover Colorado, she was told repeatedly by both Chappuis and Ryan that CSL Syvrud would continue to cover Colorado for Sales Representative Marko Cikara (one of the Defendant's top-selling Sales Representative of Pre-Surgical 2% CHG Cloths) "for business reasons."

118. Several Sales Representatives including Merriman, Hardy and John Vorwerk told Relator that CSL Syvrud was "helping sell" the CHG Cloths off label and that Ms. Syvrud "knew how to play the game," meaning that CSL Syvrud used her position as CSL to help sell the Pre-Surgical 2% CHG Cloths off label.

119. Relator often reported these improper off-label solicitations to Director Ryan, but Ryan did nothing to stop the illegal behavior.

120. The solicited contact by CSLs initiated by Sales Representatives as part of their sales tactics became so prolific that Director Ryan suggested to Company Executives that Defendant implement a form that the customers could submit on their own to request off-label information to help cut down on the off-label violations, but the Sales Representatives fought the implementation of such forms and Sage never adopted them.

121. To date, Defendant has failed to implement any process to verify that customers contacted by CSLs are truly an unsolicited request rather than being used as a fraudulent baiting tactic routinely employed by the Sales Representatives.

122. Defendant has not taken the necessary and appropriate steps to train its employees, including its Sales Representatives, about compliance issues. Sage Products has no compliance policies concerning off-label practices by its Sales Representatives or other Executives in the Company, conducts no compliance training sessions and has no compliance employee manual.

123. Due to the prolific and blatant off-label violations within the Company, Relator recommended that Sage Products implement a formal, written

CASE NO. 11-CV-2975-WQH(JMA)

1  process for documenting all noncompliance events or issues. Relator's
2  recommendation was ignored and no such procedure was ever implemented by
3  Sage. To the contrary, Relator was chastised for suggesting that such events be
4  memorialized because such written documentation could be compromising to the
5  Company.

6      124.  In addition to the salesforce.com database (which was implemented in
7  late 2011), additional e-mail archives to search for examples of these illegal off-
8  label tactics include those of CSLs Laura Syvrud (LSyvrud@sageproducts.com),
9  Christian Winkle (CWinkle@sageproducts.com), Julie Wakefield
10 (JWakefield@sageproducts.com) and Marcia Bauman
11 (MBauman@sageproducts.com) and CSL Team Assistant Jessica Hams
12 (JHams@sageproducts.com). Hams frequently sent training video link information
13 directly to customers and received e-mails from both Sales Representatives and
14 customers about issues relating to off-label marketing. Additionally, although it
15 was a Company-wide practice, particularly egregious Sales Representatives who
16 solicited customers directly and through the use of CSLs for illegal off-label
17 marketing include but are not limited to: Marko Cikara (Colorado)
18 (MCikara@sageproducts.com), Edward Graham (Philadelphia)
19 (EGraham@sageproducts.com), Anthony Furio (Chicago)
20 (AFurio@sageproducts.com), Jef Malpass (Seattle)
21 (JMalpass@sageproducts.com), David Morse (New Mexico and Arizona)
22 (DMorse@sageproducts.com), Bryan Hardy (East Los Angeles)
23 (BHardy@sageproducts.com) and Jeff Merriman (JMerriman@sageproducts.com).

24     125.  Finally, as outlined in detail below in Section H of the First Amended
25 Complaint, despite the creation of the Off-Label Team, Defendant Sales
26 Representatives continue to promote use of the Cloths at temperatures well above
27 those approved by the FDA, which increases the risk of infection to patients.

28

### E. Defendant's Sales Representatives Directly Engage in Daily Bathing Off-Label Selling with Customers Without Any CSL Involvement

126.   In addition to using Relator to contact customers to help promote off-label orders and bringing Relator in at the end of an off-label sale after the Sales Representative had already engaged in off-label marketing, Defendant's Sales Representatives also directly promote daily bathing off-label orders to customers without ever bringing a CSL in the loop.

127.   Relator had numerous conversations with Sales Representative Jeremy Merriman about how he, as a Sales Representative, could not speak to customers about off-label uses of the Pre-Surgical 2% CHG Cloths.  On or about September 5, 2013, Relator was explaining again to Merriman why all off-label discussions needed to go through her and that he could not have off-label conversations with customers.  Merriman interrupted Relator to say, "I'm just going to tell you what I tell my wife; we are going to agree to disagree because I don't want to sleep on the couch."

128.   In that same conversation with Merriman when Relator was explaining to him why the clinical information she shared should be in FDA compliance and should be true to help customers reduce infections in their patients, Merriman interrupted her again to say, "Listen, I don't care if every patient in that hospital dies.  All I care about is my money."  Merriman said this two more times during this phone call and another time on a September 6, 2013 call with Relator.

129.   Sales Representatives such as Merriman would tell Relator how they used to market off label and give out off-label materials all of the time (with huge success) and they could not understand why she was giving them a hard time about doing so now.

130.   During a meeting in a Starbucks in downtown Seattle on December 12, 2013, top-selling Sales Representative Jef Malpass told Relator that he did not

31

even have one hospital left in his territory that was not doing off-label daily bathing. As he said this, he smiled and bragged how he had pretty much "saturated the Washington market."

131.  By way of another example, Director Ryan told Relator that Sales Representative Edward Graham, one of Defendant's top-selling Sales Representatives out of Philadelphia, not only sold Pre-Surgical 2% CHG Cloths off label for daily bathing, but *also trained* all of the hospital staff on proper off-label bathing application.

132.  This fact is reflected in a thesis written by one of Graham's customers in Philadelphia.  A Master's Degree Nurse wrote in her thesis about Graham's involvement in the implementation of the Pre-Surgical 2% CHG Cloths for her hospital's daily bathing practice.  She wrote how instrumental Graham had been and how he trained all of the staff on the proper use of the off-label daily bathing application throughout the hospital.

133.  Defendant Sales Representatives also promote off-label Cloth orders by promoting the Cloths for use on Cesarean section patients after the Cesarean section operation.

134.  Early in Relator's employment, Relator attended her first National Sales Meeting in the Fall of 2011. At that meeting, Defendant Sales Representative Deric Rauch (from Defendant's Northwest (Portland) Territory) complained to Relator that she was making "too big of a deal" about Sales Representatives selling Defendant's Pre-Surgical 2% CHG Cloths off label for daily bathing.  To illustrate his point, Rauch pointed to the Rx Q*Care CHG Oral Rinse being sold off label for hospital patients for VAP prevention and not gingivitis (as outlined in detail above).

135.  Relator also observed that during her tenure from 2011 and continuing to at least April 14, 2014, when she was terminated, Sales Representatives continue to hand out Sage's Off-Label Bathing Instructions, which are outlined above.

32

136.   Internal Sage Reports document the Sales Representatives' off-label activities.   At the National Sales Meeting in the Fall of 2013 in Cary, Illinois, Director Ryan told Relator that based on confidential data being collected over the past 3 years, Sage Executives could "track and trend off-label CHG Cloth dollars per territory" and the requests being made to CSLs.   According to Ryan, the figures showed that the Sales Representatives were selling off label without using a CSL or even bringing a CSL in at the end of the transaction to give even the appearance of compliance.

137.   Director Ryan said it was "obvious" from these reports of off-label sales numbers and no CSL activity that top-selling Sales Representatives were selling off label.   Director Ryan also said that they were doing so without any negative consequences.

138.   When Relator questioned Director Ryan and Vice President of RA/QA Haley why Sage did not get the FDA approval for daily bathing, they stated that it did not make business sense to get the approval because Sage was selling off label so well without the approved indication. They also indicated that Sage did not want to spend the money to get the approval and that, if they did, competitors would be able to knock off the product and cut into Sage's profit margin.

F.   **Defendant Required Relator and Other CSLs to Receive Training at Defendant's National Sales Meetings**

139.   Under FDA rules and regulations, CSLs are strictly prohibited from selling products and are supposed to operate independently from the sales force. However, Defendant made it clear to Relator and other CSLs that they should be selling product as part of their jobs as CSLs.

140.   As part of Defendant's scheme to have its CSLs selling to customers off label, Defendant required Relator and the other CSLs to attend and participate

33

1  in all of Defendant's National and Regional Sales Meetings, which each occurred
2  once a year.

3      141.  National Sales Meetings in the Fall were held in Cary, Illinois, where
4  Defendant is headquartered.  National Sales Meetings in the Spring alternated
5  between downtown Chicago and other locations where Defendant does business,
6  such as Dallas.

7      142.  While at the National and Regional Sales Meetings, Relator and the
8  other CSLs were required to attend sales training sessions, including breakout
9  sessions.

10     143.  At the National Sales Meetings, Relator and the other CSLs were
11  required to watch mock sales pitches and learn ways to deflect objections to
12  purchasing product.  Relator and the other CSLs also learned that they should
13  capitalize on the threat by Medicaid/Medicare of not reimbursing hospitals for
14  preventable errors and hospital-acquired infections.

15     144.  In addition to the National and Regional Sales Meetings twice a year,
16  Relator and the other CSLs also were required to attend on-going sales training
17  sessions throughout the year.

18     145.  Director - Medical Liaison Team Ryan stated to Relator that CSLs
19  should not be attending the sales meeting sessions but Defendant required them to
20  attend nonetheless.  This was likely a joint decision between Director Ryan and her
21  boss Vice President of RA/QA Sean Haley.

22     146.  The expectation that Relator and other CSLs engage in off-label
23  selling was reinforced at a business trip in Salt Lake City on May 6-7, 2013.
24  During that meeting, Vice President Haley spoke at length to Relator and others
25  about the role of the Off-Label Team and stated, "We are a sales organization, so at
26  the end of the day, *we* are *all* selling something, *including you*."

27     147.  Throughout Plaintiff's employment, Paul Hanifl, one of the Founders
28  and currently Sage's Vice President, repeatedly stated on behalf of Sage Products

CASE NO. 11-CV-2975-WQH(JMA)

1  that Sage did not have to comply with FDA regulations or guidelines since Sage
2  was not "selling a medication."

3  **G. Defendant Required Relator and CSLs to Present Off-Label**
4  **Information at National Sales Meetings**

5      148.  Not only were Relator and other CSLs required to attend and get sales
6  training at Defendant's National and Regional Sales Meetings but they also were
7  required to *give* off-label sales training to Defendant's Sales Representatives.

8      149.  For example, at the National Sales Meeting in the Spring of 2012 in
9  Chicago, Vice President (and attorney) Matt Ross had Relator and her Off-Label
10  Team instruct Sales Representatives from the Northwest and Northeast Territories
11  on off-label information.

12     150.  Relator and her Team coached these Sales Representatives by sharing
13  off-label information and clinical decision making so that the Sales
14  Representatives could enhance their off-label selling skills.

15     151.  When one of the Canadian Sales Representatives asked a question that
16  brought up the issue of selling off label in Canada, Vice President of Sales
17  Haggness abruptly ended the presentation by saying, "Let's just take this off-line.
18  The presentation is over."

19     152.  In addition, Sage paid speakers such as Kathleen Vollman, RN, to
20  attend its National Sales Meetings to teach its Sales Representatives about off-label
21  information and clinical decision making so that the Sales Representatives could
22  enhance their off-label selling skills.  As far back as 1998, Vollman did marketing
23  and sales training for Sage at its National Sales Meeting held in Crystal Lake,
24  Illinois.  On January 31, 2011, at Sage's National Sales Meeting at the Grand Hyatt
25  in Tampa, Florida, Vollman taught the Sales Representatives about daily bathing
26  with Pre-Surgical 2% CHG Cloths with her topic, "The Other Side of the Curtain:
27  Today's Turned Patient."  Similarly, Vollman taught the Sales Representatives to
28  sell the cloths for daily bathing of the entire body to prevent hospital-acquired

infections with her presentation entitled "Selling With Science" at the 2002 National Sales Meeting in Crystal Lake, Illinois.

## H. Defendant's Sales Tactics Increase the Risk to Patients of Bacterial Infection

153.  In addition to the other risks associated with the off-label use of daily bathing outlined below (skin irritation and burning, allergic reactions, nerve damage, chlorhexidine resistance, antimicrobial resistance, cost, waste and other ecological long-term effects), another one of the known risks of using Defendant's Pre-Surgical 2% CHG Cloths is that the Cloth is contaminated and exposes the patient to bacterial infection.  Defendant's sales tactics are not only illegal and off label, but they also actually increase the risk of contamination of the Cloths and therefore increase the risk of infection (and harm) to patients.

154.  On November 13, 2013, the FDA issued a warning prompted by "continuing reports of infections resulting from antiseptic products labeled for preoperative [skin] preparation."  The FDA warned that "health care professionals and patients should follow all label directions to decrease the chances of infection." The FDA also warned that the "reported outcomes associated with contaminated topical antiseptics [have] ranged from localized infections at injection sites to systemic infections that resulted in death," and noted that affected products included chlorhexidine gluconate.  The FDA also notes that organisms implicated in the outbreaks included *Burkholderia cepacia*, the organism found in Sage's contaminated CHG Cloths (a repeat violation), as noted above.

155.  The FDA concludes by warning drug manufacturers such as Sage that "to reduce the risk of infection, ensure the products are used according to the directions on the label."

156.  As noted above, and in direct contravention of the recent FDA warning in 2013, Defendant tells its customers to "ignore the FDA label" and use the Off-Label Daily Bathing Instructions handed out by its Sales Representatives.

36

Because Defendant's Cloths are used off label for bathing the entire body (as opposed to the much smaller, FDA-approved 5 x 5 or 2 x 5 inch surgical sites), patients resisted use of the Cloths for daily bathing of the entire body because the Cloths were cold and caused the patients discomfort.

157.   Beginning in at least 2005 and continuing to the present, as a way to counter this objection (and, as outlined below, as a kickback to induce orders), Defendant provides "free" Cloth warmers (valued at approximately $2,000 each) to customers so long as the customer keeps ordering the Cloths.

158.   The FDA-approved label instructs consumers to store the product between 68-77° Fahrenheit and to avoid excessive heat above 104° Fahrenheit. However, Defendant instructs its customers to keeps the Cloths at 125° Fahrenheit. When customers questioned whether they should be doing this because it is contrary to the label instruction, Sage responds with a letter stating that it had done testing showing that the warmed Cloths were stable up to 84 hours when warmed to 125° Fahrenheit and that when warmed, the Cloths should be discarded after 84 hours.

159.   The Sage warmer letter goes on to say that the customer must have the warmer on the "CHG Setting" and the 125° should not exceed 84 hours. The "free" Sage warmer that was provided to customers had a setting (the "Dispose" setting) that could be set to signal when a specific package had been in the warmer for 84 hours.  However, the routine practice of the Sales Representatives (who set the warmer settings for the customers and gave them instructions on use) was to keep the warmer on the "Bath Setting," which means the product was exposed to heat indefinitely and never disposed. Another sales tactic was to instruct the customer to simply place the Cloths in another slot when the "Dispose" signal came on, which would also result in the product being exposed to heat indefinitely and never disposed.

**CASE NO. 11-CV-2975-WQH(JMA)**

160. Indefinite exposure to excessive heat causes two problems: the Cloths were no longer effective after the prolonged heat exposure; and the Cloths could become contaminated with bacteria that would cause infection.

161. This practice raised a level of concern such that Kaiser facilities received citations and warnings that the Cloths should be treated like a medication and properly disposed of when expired.

162. Customers did not want to dispose of the Cloths after 84 hours because of the cost and waste involved.

163. Defendant's Oakland, California Sales Representative Chris Moreno stated to Relator that the "Dispose Setting" was more "headaches" than it was worth and that he instructed customers to disregard it and use the "Bath Setting."

164. Defendant's Phoenix, Arizona Sales Representative David Morse was upset with Relator after she shared the Sage warmer letter referenced above with a customer, stating that he just keeps the warmers on the "Bath Setting" at 104° to avoid waste and having to "explain" the "warmer letter issue."

165. Upon visiting customer Multi-Care Tacoma on April 10, 2014, Relator with Critical Care Manager Lescia Myers observed that the free Sage warmer was set at 125° on the "Bath Setting." Myers told Relator that this was how Sales Representative Jeff Malpass had originally "set the warmer up when he brought in the CHG bathing."

I. **Defendant Suppresses the Known Risks of Using CHG Cloths for Daily Bathing**

166. Under FDA rules and regulations, the CSLs are supposed to provide balanced information about the off-label use of Defendant's products, including negative aspects and risks of off-label use.

167. Despite FDA rules and regulations, known risks of using the Pre-Surgical 2% CHG Cloths and known alternatives to the Cloths, Defendant did not allow Relator or the other CSLs to include any negative information or information

38

that suggested a CHG solution (as opposed to a CHG-impregnated cloth) was an equivalent to CHG Cloths or even beneficial.

168.  Negative aspects and risks of using the Pre-Surgical 2% CHG Cloths for the off-label use of daily bathing in addition to contamination and bacterial infection include skin irritation and burning, allergic reactions, nerve damage, chlorhexidine resistance, antimicrobial resistance, cost, contamination, waste and other ecological long-term effects.

169.  These negative aspects and risks also apply to the off-label use of Rx Q*Care CHG Oral Rinse.

170.  Chlorhexidine resistance and antimicrobial resistance are serious risks. According to a 2014 Johns Hopkins study, bacteria responsible for bloodstream infections are growing less susceptible to CHG.  In the study, investigators compared bacterial resistance between cultures from patients in 8 ICUs receiving daily antiseptic washes to patients in 30 non-ICUs who did not bathe daily with CHG.  Bacterial cultures obtained from the CHG-bathed patients showed reduced susceptibility to CHG when compared to those patients who did not have antiseptic baths.  And, regardless of the unit protocol, 69% of all bacteria showed reduced CHG susceptibility.

171.  According to information provided by the Agency for Healthcare Research and Quality ("AHRQ"), which is an agency within the United States Department of Health and Human Services, the risks associated with using CHG include skin irritation, rash and/or redness and "severe allergic reactions of hives, itching."  In addition, although rare, anaphylaxis can occur (difficulty breathing; tightness in the chest; swelling of the mouth, face, lips or tongue) with CHG use. Also according to information provided by the AHRQ, "[i]t is important to keep the CHG out of eyes and ears. CHG can cause permanent injury if it comes in direct contact with nerves and is allowed to remain there. For example, this may occur if CHG enters the ear canal and the patient has a perforated (punctured)

39

1  eardrum. If CHG enters the patient's eyes or ears, it is important to rinse promptly
2  and thoroughly with water."

3      172.   There is at least one study showing the effectiveness of CHG bathing
4  in a basin (a much less costly way to bathe patients), making CHG basin bathing
5  comparable to CHG-impregnated cloths. In addition, bathing with CHG-
6  impregnated cloths results in a lot more waste for the hospital to dispose of
7  compared to CHG bathing with a basin.

8      173.   Defendant's Senior Regulatory Affairs Specialist Denise Hummel
9  received several complaints about using the Pre-Surgical 2% CHG Cloths,
10 including but not limited to complaints of skin irritation, burning and redness and
11 eye burning after being splashed when opening the cloth packaging.

12     174.   The increase cost of using Defendant's CHG Cloths was significant
13 (and a major reason why customers did not want to dispose of expired Cloths, as
14 outlined above). Defendant's CHG Cloth bath is approximately $5-6/bath. Bathing
15 with soap and water is approximately $1.50/bath. Bathing with a CHG bottle and a
16 basin is approximately $2-3/bath.

17     175.   As a CSL, Relator and the other CSLs were supposed to present the
18 risks and drawbacks of using the Pre-Surgical 2% CHG Cloths and let the
19 customer draw their own conclusions about which bathing method was best.

20     176.   Although there were risks and drawbacks associated with using the
21 Pre-Surgical 2% CHG Cloths, Relator and the other CSLs did not include any
22 negative information in the information they provided to customers. The Sage-
23 approved messages they were required to use contained only positives of daily
24 bathing.

25     177.   Defendant created a "CHG Overview Presentation" for its Off-Label
26 Team to use when responding to unsolicited requests for off-label information
27 about using CHG Cloths for daily bathing. The presentation specifically included a
28 section entitled "CHG Daily Bathing." On numerous occasions, members of the

1  Off-Label Team including but not limited to Ron Chappuis, when he was Director

2  of the Off-Label Team, and CSL Laura Syvrud regularly showed the CHG

3  Overview Presentation including the off-label section about CHG Daily Bathing to

4  large groups of customers and prospective customers *without* unsolicited requests

5  for the information.

6      178.   On November 4, 2011, Director Chappuis showed the CHG Overview

7  Presentation to attendees at a meeting of the Association for Professionals in

8  Infection Control and Epidemiology ("APIC") in Las Vegas. APIC is the leading

9  professional association for infection preventionists and has more than 15,000

10 members.

11     179.   Relator Salgado expressed concern about using the CHG Overview

12 Presentation without unsolicited requests for off-label CHG daily bathing. When

13 she refused the requests from Defendant's Sales Representatives in her territory

14 that she present the CHG Overview Presentation to their prospective customers,

15 they were hostile to her and told her she was making a "big deal about nothing,"

16 that her team (the Off-Label Team) and role (Clinical Science Liaison) were "just a

17 big formality" and that she needed to "just relax."

18     180.   The CHG Overview Presentation did not disclose any risks other than

19 stating, in the form of a question, "Antimicrobial Resistance Concern?"   It

20 answered that question in the negative, stating, "Chlorhexidine has a long-standing

21 track record of being a safe and effective product with broad antiseptic activity and

22 little evidence of emerging resistance."

23     **J.  Requests For Relator to Speak Off Label Illegally at Conferences**

24     181.   Another off-label sales tactic employed by Defendant's Sales

25 Representatives and, moreover, its Regional Managers, was to request CSLs (and

26 Directors like Director Chappuis above in ¶ 176 above) to speak off label at

27 conferences with customers and potential customers in the audience.   These

28

41

1   improper requests started shortly after Relator started and continued up until the
2   time she was terminated on April 14, 2014.

3       182.   For example, in late 2011, Sales Representative Jose Reyes asked
4   Relator to speak off label at an APIC conference and also to perform an off-label
5   shift-to-shift training of all nurses in a key account.   Reyes emphasized how
6   profitable it would be for Defendant. Relator declined and offered to give an on-
7   label alternative and a one-on-one discussion to staff at Reyes's key account per
8   FDA guidelines, but both options were rejected and the trip was cancelled after
9   Reyes spoke with his Sales Manager.

10       183.   These improper requests also came from a high-level Sales Executive.
11   In early 2012, Regional Sales Manager Todd Kieling (West Coast Territory) asked
12   Relator to speak off label to existing key customers at a large private dinner in
13   Orange County. Coming from a high-up sales manager, Relator was taken by
14   surprise. She informed her supervisor at the time, Director Chappuis. Director
15   Chappuis informed Relator that she should do it if she felt comfortable. Relator did
16   not feel comfortable and informed Regional Manager Kieling that she would speak
17   on label only.   Regional Manager Kieling declined.   Relator noticed later that
18   Regional Manager Kieling and other Regional Managers and Sales Representatives
19   would hire paid speakers to do off-label presentations, as outlined below.   CSLs
20   who did speak off label at these customer meetings were Ron Chappuis (when he
21   was a CSL) and Laura Syvrud.

**K. Defendant's Continued Illegal Off-Label Marketing of Rx Q*Care**
**CHG Oral Rinse for the Prevention of Pneumonias**

24       184.   Selling Rx Q*Care CHG Oral Rinse off label to hospitals and
25   residential care facilities for the prevention of HAP and VAP is much more
26   profitable than selling for the more limited on-label use of the prevention of
27   gingivitis.   The Rx Oral Rinse is the number one selling drug of Defendant

28

(followed closely by the Pre-Surgical CHG Cloths) with annual sales in the millions.

185.    Shockingly, Defendant never bothered to train Relator or the other CSLs on the Off-Label Team to respond to or provide any off-label information to customers about Rx Q*Care CHG Oral Rinse.

186.    During her tenure as CSL on the Off-Label Team, Relator never received one request from a Sales Representative or customer about Rx Q*Care Oral Rinse.

187.    It was common knowledge within the Company – both at the Executive level and the Sales Representative level – that the Sales Representatives sell Defendant's Rx Q*Care Oral Rinse to hospitals and other non-dentist customers for the prevention of pneumonias.

188.    As noted above, Director Ryan told Relator that Defendant has never perceived off-label selling of Rx Q*Care Oral Rinse as a risk, and Sales Representative Rauch pointed to Defendant's off-label selling of the Rinse to make his point about being able to sell the Pre-Surgical 2% CHG Cloths off label (see ¶ 133, supra).

189.    In fact, Sage's Vice President of Sales Operations Dave Wilhelmi trains new Sales Representatives in their new-hire training and the entire sales force at National Sales Meetings to sell the Rx Q*Care Oral Rinse for the prevention of VAP.

190.    Sales Representatives also are trained by Kathleen Vollman who is paid to attend National Sales Meetings to present off-label topics such as "VAP & IPH: How Can Hospitals Tailor Their Preventative Strategies to Prevent VAP."

191.    In addition, Defendant's marketing "leave behind" materials for Rx Q*Care CHG Oral Rinse show that Defendant's sales force and marketing managers continue to blatantly promote Defendant's Rx Q*Care CHG Oral Rinse

43

1    to hospitals and resident-care facilities (and not to dentists) for off-label uses of
2    prevention of pneumonias.

3        192.  From at least 2011 and upon information and belief continuing to
4    today, Sales Representatives use a sales and marketing brochure for the CHG Oral
5    Rinse entitled, "ORAL HYGIENE:  Q*Care® Oral Cleansing & Suctioning
6    Systems and Toothette® Oral Care" (referred to herein as the "Rx Q*Care® CHG
7    Oral Rinse Marketing Brochure") to pitch the Rinse to hospitals, pediatric hospitals
8    and resident-care facilities.

9        193.  The first page of the Rx Q*Care® CHG Oral Rinse Marketing
10   Brochure states at the top, "THE IMPORTANCE OF ORAL CARE IN
11   ADDRESSING HAP AND VAP RISK FACTORS." (Capitalization in original.)

12       194.  The first page goes on to state, "Hospital-acquired pneumonias
13   (HAPs), including ventilator-associated pneumonia (VAP), often start in the oral
14   cavity.  Bacteria, including dental plaque, can colonize in the oropharyngeal area,
15   and these pathogens can be aspirated into the lungs, causing infection.  VAP is the
16   most common infectious complication among ICU patients and accounts for over
17   47% of all infections.  Non-vent patients with conditions including dysphagia,
18   stroke, COPD and malignancy are also at risk for HAP." (Citing 2003
19   Recommendations of Centers for Disease Control ("CDC")) (other citations
20   omitted.)

21       195.  The first page also warns customers that "[t]he Centers for Disease
22   Control and Prevention (CDC) has proposed a change to the way VAP surveillance
23   is reported through the National Healthcare Safety Network (NHSN).  Under the
24   proposal, hospitals would be required to publicly report VAPs, Ventilator-
25   Associated Conditions (VACs) and infections with Ventilator-Associated
26   Conditions (IVACs)."          (Citing        CDC        website        at
27   http://www.cdc.gov/nhsn/PDFs/vae/CDC_VAF_CommunicationsSummary-for-
28   compliance_20120313.pdf.)

196.   The first page also contains pictures of "BIOFILM FORMING OVER A 24-HOUR PERIOD" and goes on to state, "BIOFILMS:   A RISK FACTOR FOR PNEUMONIA." (Capitalization in original.)

197.   The Rx Q*Care CHG Oral Rinse Marketing Brochure goes on to warn customers that "[b]iofilms have been found to be involved in up to 80% of infections" and further provides the following:

VAP CONSEQUENCES:

- Mortality rate of up to 76%.
- Mean hospitalization costs were $99,598 for patients with VAP and $59,770 for patients without VAP (P<.0001), resulting in an absolute difference of $39,828.
- Mean length of stay can reach 23 days.
- 9.6 additional days on the vent, 6.1 extra days in the ICU and 11.5 more days in the hospital.

(Capitalization in original.)

198.   The Rx Q*Care CHG Oral Rinse Marketing Brochure also provides the following:

COMPREHENSIVE ORAL HYGIENE ADDRESSES THREE KEY VAP RISK FACTORS:

- Bacterial colonization of the oropharyngeal area.
- Aspiration of subglottic secretions.
- Colonization of dental plaque with respiratory pathogens.

(Capitalization in original.)

199.   The Rx Q*Care CHG Oral Rinse Marketing Brochure further discusses healthcare-associated infections in acute care hospitals and ventilator-associated pneumonia and the benefits of the CHG Oral Rinse in preventing such pneumonias.

45

200.   The Rx Q*Care CHG Oral Rinse Marketing Brochure displays a bottle of the CHG under the heading "Q*CARE® 24-HOUR SUCTION SYSTEMS:  For patients who cannot expectorate and cannot perform their own oral care."

201.   The Rx Q*Care CHG Oral Rinse Marketing Brochure also showcases Sage's yankauer holder that provides "easy access" to the yankauer during the patient's "Length of Stay (LOS)."

202.   The Rx Q*Care CHG Oral Rinse Marketing Brochure also showcases Sage's "Space-saving Bedside Bracket [that] helps increase compliance to protocol."

203.   Marketing references to LOS and bedside brackets apply only to hospitals, pediatric hospitals and other healthcare facilities – and not to dentists.

204.   Defendant also markets it Rx Q*Care CHG Oral Rinse in a pamphlet for hospitals and the like (and not dentists) entitled, "Pre-Operative CHG Kit:  Skin antisepsis and oral cleansing prior to surgery" (the "Rx Q*Care CHG Oral Rinse Marketing Pamphlet").

205.   That Rx Q*Care CHG Oral Rinse Marketing Pamphlet provides, "PATIENT'S BACTERIAL FLORA -- #1 RISK FACTOR FOR SURGICAL INFECTIONS:     Sage® 2% CHG Cloths and 3M$^{TM}$ Peridex$^{TM}$ 0.12% Chlorhexidine Gluconate (CHG) Oral Rinse help address infection risk factors for two reservoirs of bacteria – the skin and oral cavity.  Use the night before and the morning of surgery as part of your Pre-Operative infection prevention efforts." (Capitalization in original.)

206.   Selling and marketing Rx Q*Care CHG Oral Rinse to use the night before and the morning of surgery as part of a Pre-Surgical infection prevention plan is off label.

46

207.   Defendant's sales and marketing materials for Rx Q*Care CHG Oral Rinse are all geared toward hospitals, pediatric hospitals, resident-care facilities and other non-dentist customers that would have a need to prevent HAP and VAP.

208.   Defendant does not market the rinse to dentists for the on-label "use between dental visits as part of a professional program for the treatment of gingivitis as characterized by redness and swelling of the gingivae."

209.   Customers also can access the above-referenced Rx Q*Care Marketing Brochure and Pamphlet from Defendant's website through the "literature" link.

210.   In addition to sales and marketing materials, Defendant made off-label claims of its Rx Q*Care CHG Oral Rinse off label on its website.

211.   As outlined above, Company websites constitute labeling as defined in and are considered promotional. *See* 21 U.S.C. § 321(m); 21 C.F.R. § 202. Website representations and suggestions that are false and misleading within the meaning of 21 U.S.C. § 352(a) are also considered violative advertising.

212.   Defendant's website lists its "3M Peridex™ (Chlorhexidine Gluconate 0.12%) Oral Rinse" as the first of its "CLEANSING SOLUTIONS" associated with its "Oral Hygiene" "Toothette® Oral Care."

213.   Like its sales and marketing materials, Defendant's website advertises its "Oral Hygiene" products by urging customers to "Address risk factors for healthcare-acquired pneumonias (HAPs), including ventilator-associated pneumonia (VAP), with Toothette® Oral Care – **the #1 brand of comprehensive oral care** and the only brand with proven clinical outcomes." (Emphasis in original.)

214.   Defendant's website also states, "Our latest offering, new **Continuous Care ™** oral cleansing and suction systems has been developed to address pneumonia risk for the non-ventilated patient.   Dysphagia, or difficulty swallowing, is often a consequence of stroke.  About 500,000 patients per year in

47

1 the US are affected by dysphagia due to stroke." (Citation omitted, emphasis in
2 original.)

3    215.   Defendant's website also states, "Q*Care's comprehensive approach
4 to oral care focuses on cleaning, debriding, suctioning and moisturizing the entire
5 oral cavity.   In fact, **professional organizations are now recognizing**
6 **comprehensive oral care as key to addressing VAP and HAP.**" (Emphasis in
7 original.)

8    216.   Defendant's website also states, "Toothette's comprehensive approach
9 **addresses key VAP risk factors:**

- Bacterial colonization of the oropharyngeal area
- Aspiration of subglottic secretions
- Colonization of dental plague **(biofilms)** with respiratory pathogens

(Emphasis in original.)

15    217.   Defendant's website also lists next to a picture of its Rx Q*Care CHG
16 Oral Rinse one of the "Benefits," "Prescription requires further documentation
17 which promotes better oral care compliance."

18    218.   Defendant's Facebook page links customers and potential customers
19 to a #SageUniversityEdu link entitled, "Room for Improvement in Reducing
20 VAP."

21    219.   Sage's Director - Medical Science Liaison Ryan told Relator that Sage
22 Executives have said that Defendant does not perceive the off-label selling of Rx
23 CHG Oral Rinse as a risk and they were not going to get a New Drug Indication
24 for pneumonia.

## L. Defendant's Continued Off-Label Marketing of Rx Q*Care CHG Oral Rinse for Use on Pediatric Patients

27    220.   There is a warning on the FDA label for Defendant's Rx Q*Care
28 CHG Oral Rinse that states:   "**PEDIATRIC USE:**   Clinical effectiveness and

48

1  safety of Peridex™ Oral Rinse have not been established in children under the
2  age of 18." (Emphasis in original.)

3     221.  Moreover, according to pediatric nursing guidelines published in
4  *Pediatric Nursing*, March-April 2010/Vol. 36/No.2 at p. 91, CHG 0.12% Oral
5  Rinse should not be used *at all* on children under the age of 6.

6     222.  Defendant promotes and sells its Rx Q*Care CHG Oral Rinse for
7  children at children's hospitals throughout the United States.

8     223.  Almost all of Defendant's Sales Representatives had at least one
9  children's hospital within their territory or at least one pediatric unit within their
10  major adult hospital accounts.

11     224.  Relator learned during sales training as a new hire in the Fall of 2011
12  that Sales Representatives are trained to offer children's hospitals the "petite size"
13  Toothette with Rx Q*Care CHG Oral Rinse.

14     225.  When Relator asked Director Ryan about a Sage Pediatric oral kit,
15  Ryan said Sage did not actually have pediatric approval so Sage's "work around"
16  was a "petite" size.

17     226.  Infection Control Practitioners, Nursing Directors and Unit Managers
18  at hospitals, including pediatric hospitals, are the main call point for Defendant's
19  Sales Representatives.

20     227.  Director Ryan herself engaged in off-label selling of the Rx Q*Care
21  Oral Rinse, including promoting the product for pediatric patients.  She was quoted
22  next to a photograph of a ventilator patient being treated with the Q*Care Oral
23  System with a caption that read, "Q*Care Oral Cleansing and Suctioning Systems
24  from Sage Products" in the January 2009 edition of *Infection Control* as saying,
25  "There have been many instances in which an institution has implemented
26  bundling into their treatment regime and found significant improvement in
27  outcomes.    Children's Healthcare of Atlanta instituted both ventilator and
28  comprehensive oral-care bundling in its neonatal intensive care unit (ICU) to

1   address VAP. A 69% decrease in VAP rates was noted, along with significant cost
2   savings."

3   228. Prior to working as a CSL at Sage, Relator worked at a children's
4   hospital in San Diego – Rady Children's Hospital – and was solicited by Defendant
5   for off-label prescriptions of the CHG Oral Rinse. Relator worked at Rady from
6   2004-2011. From 2008-2011, she was Program Coordinator for the Infection
7   Control Program and the principal Infection Control Practitioner. During that time,
8   Defendant Sales Representative John Vorwerk promoted off-label CHG Oral Rinse
9   (petite version) prescriptions to Relator. He said it would help prevent VAP in the
10  pediatric patients.

11  229. Defendant continues to sell Rx Q*Care CHG Oral Rinse to Rady
12  Children's Hospital as well as to other children's hospitals including but not
13  limited to:    Children's Hospital & Research Center Oakland (California),
14  Children's Hospital Los Angeles, Children's Hospital of Orange County, Loma
15  Linda University Children's Hospital (California), Lucile Packard Children's
16  Hospital at Stanford (Palo Alto), Miller Children's Hospital (California), Phoenix
17  Children's Hospital, Children's Hospital Colorado, Arkansas Children's Hospital,
18  St. Joseph Children's Hospital of Tampa, The Children's Hospital of Philadelphia
19  (CHOP), Children's Hospital of Pittsburgh, Penn State Children's Hospital at the
20  Milton S. Hershey Medical Center, Children's Medical Center – Dallas, Cook
21  Children's Health Care System (Texas) and Covenant Children's (Texas).

## M. Defendant's Executives Know About the Off-Label Practices and Provide Lucrative Rewards To Sales Representatives Based on Off-Label Sales

24  230. Defendant's Executives condone off-label marketing by Sales
25  Representatives and, in fact, encourage and reward off-label selling with lucrative
26  financial incentives.

27  231. The blatant off-label marketing practices of Defendant's Sales
28  Representatives are known and condoned at the highest levels in Sage. As noted

50

above, Director Ryan told Relator that Sales Representative Edward Graham not only sold Pre-Surgical 2% CHG Cloths off label for daily bathing and for bathing of the entire body, but *also trained* all of the hospital staff on the proper use of the off-label application. This Sales Representative and his off-label sales tactics were documented in a thesis paper written by one of the nurses at the time.

232. Also as noted above, Defendant's Executives have reports that track off-label sales.

233. Numerous reports of specific off-label misconduct have been reported to high-level Sage Executives, but nothing is done. Relator was told by CSLs such as Julie Wakefield and Marcia Bauman about off-label misconduct by Sales Representatives in their territories. The CSLs reported the misconduct to the Regional Sales Managers in the territories, but there was no discipline issued to the Sales Representatives.

234. Off-label misconduct by Defendant's Sales Representatives – including promoting off-label orders and prescriptions with customers, training customer staff on off-label daily bathing of the entire body and improper distribution of off-label literature – is occurring in every State in the United States, the District of Columbia and Puerto Rico.

235. Defendant fails and refuses to discipline its Sales Representatives or Executives for off-label marketing. To the contrary – Defendant rewards these top-selling Representatives for their off-label sales efforts with large monetary bonuses tied to sales including off-label sales.

236. At the National Sales Meeting in Spring 2014 in Chicago, Sage founder Vince Foglia addressed the sales force (and CSLs, including Relator, and Director - Medical Liaison Team Ryan) and congratulated many of the Sales Representatives on joining "the 1%" in America because of the banner year the Company, and specifically, sales of Pre-Surgical 2% CHG Cloths, enjoyed in 2013.

51

237.   Defendant also rewards its CSLs for their role off-label sales growth. On February 21, 2014, Director Ryan arranged for the CSLs to stay at a beachside resort while attending a "Strategic Planning Meeting" in Florida. According to Ryan, staying at the beach resort was in lieu of the CSLs being invited to the President's Circle, which was a prestigious trip for the Sales Representatives with the highest sales.

238.   As of November 25, 2013, the Company had $300 million in net sales.

239.   Director Ryan told Relator on several occasions (both before and sometimes even after Ryan became a Sage Executive) that Defendant would not change its approach to off-label compliance until something "major" occurred. She also said that Sage was doing what they could get away with off-label selling.

**N. Payments To Physicians and Other Medical Professionals to Illegally Promote Off-Label Uses of Pre-Surgical 2% CHG Cloths and Rx Q*Care Oral Rinse**

240.   Sage effectively pays others to do what it knows its Sales Representatives and CSLs should not be doing.

241.   As early as 2005 and continuing to the present, Sage Products pays medical professionals to provide slide presentations promoting the off-label use of Pre-Surgical 2% CHG cloths for daily bathing of the entire body to prevent hospital-acquired infections and Rx Q*Care CHG Rinse for the prevention of VAP at meetings of physicians and other medical professionals as well as at private events centered around extravagant dinners for customers and prospective customers.

242.   Sage Products utilized a "Paid Speakers" program to market off-label uses of Pre-Surgical 2% CHG cloths and Rx Q*Care CHG oral rinse to increase off-label business growth. The program was organized and managed by Sage's Marketing department and often led to sales of Sage's Pre-Surgical 2% CHG cloths and Rx Q*Care CHG oral rinse.

52

243. Sage provided its paid speakers no training on compliance with FDA regulatory requirements for communications.

244. To the contrary, Sage Products knew in advance of their paid speakers' presentations that the speakers' slides included information promoting the off-label uses of Pre-Surgical 2% CHG cloths for daily bathing of the entire body to prevent hospital-acquired infections and Rx Q*Care CHG oral rinse. Sage ensured that its paid speakers were promoting the CHG Cloths and Oral Rinse by requiring that the speakers submit their off-label slides in advance of their presentations for prior approval by Sage.

245. The FDA holds companies accountable for the presentations of their speakers.

246. The Pharmaceutical Research and Manufacturers of America ("PhRMA") has enacted a Code of Interactions with Health Care Professionals ("the Code"), which contains in relevant part guidelines for speaker programs:

    a. Companies should appropriately train speakers and monitor their speaker programs for compliance with FDA requirements; and

    b. Companies should ensure that their speakers and their materials disclose that the speaker is presenting on behalf of the company and that the speaker is presenting information consistent with FDA guidelines.

247. Sage neither trained its speakers nor monitored their speaker programs for compliance with FDA requirements.

248. Sage failed to ensure that its speakers and its materials disclosed that the speaker was presenting on behalf of Sage and that the speaker was presenting information consistent with FDA guidelines.

249. One of the speakers on Sage's Speakers Bureau was Kathleen Vollman, a nurse based in Michigan. Sage paid Vollman to prepare and present a

CASE NO. 11-CV-2975-WQH(JMA)

1  slide presentation promoting the use of Pre-Surgical 2% CHG cloths for daily
2  bathing of the entire body and Rx Q*Care CHG oral rinse for off-label uses.

3      250.  Throughout the 2000s, Vollman has on numerous occasions presented
4  her slides that included the off-label use of Pre-Surgical 2% CHG cloths for daily
5  bathing of the entire body and Rx Q*Care CHG oral rinse for off-label uses.

6      251.  In 2008 Vollman gave a presentation entitled "Interventional Patient
7  Hygiene: Impacting Patient Outcomes by Returning to the Basics," which included
8  slides promoting "Daily Bathing with CHG Cloths," stating that "CHG Bathing
9  Reduces CLA-BSI" (central line associated blood stream infection) and
10  encouraging "all ICUT patients receive the CHG basinless bath." One of the slides
11  in this presentation specifically mentions "Sage 2% CHG cloths" by name in
12  promoting the benefits of daily bathing the entire body with CHG cloths to prevent
13  hospital-acquired infections.

14      252.  In 2009 Vollman gave a presentation entitled "Target Zero: Strategies
15  for Reducing or Lowering/Eliminating Blood Stream Infections," which included
16  slides stating "New CMS Guidelines: If It's Not POA [present on admission], We
17  Won't Pay," promoting "Daily Bathing with CHG Cloths" and stating that "CHG
18  Bathing Reduces CLA-BSI."  One of the slides in this presentation specifically
19  mentions "Sage 2% CHG cloths" by name in promoting the benefits of daily
20  bathing the entire body with CHG cloths to prevent hospital-acquired infections.

21      253.  In 2010 Vollman gave a presentation entitled "Resuscitating the
22  Basics," which included slides promoting daily bathing with CHG cloths and
23  stating that "CHG Bathing Reduces CLA-BSI."  One of the slides in this
24  presentation specifically mentions "Sage 2% CHG cloths" by name in promoting
25  the benefits of daily bathing the entire body with CHG cloths to prevent hospital-
26  acquired infections.

27      254.  In 2011 Vollman gave a presentation entitled "Changing Work
28  Cultures to Improve Patient Safety By Returning to the Basics," which included

slides promoting daily bathing with CHG cloths and stating that "CHG Bathing Reduces CLA-BSIs." One of the slides in this presentation specifically mentions "Sage 2% CHG cloths" by name in promoting the benefits of daily bathing the entire body with CHG cloths to prevent hospital-acquired infections. Sage asked Vollman to give this presentation to Sage's customer at UCSF. After Vollman's presentation, the hospital implemented CHG bathing not just for ICU patients but for patients hospital wide, resulting in $300,000 in annual sales for Sage. One of Sage's Sales Representatives, Kyle Mowry, told Relator that it was Vollman who "sold the whole bag" at UCSF.

255. According to the FDA's Guidance for Industry: Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices, a company may not pay speakers to present off-label data at a company-sponsored promotional event, even if the attendees ask for off-label information because these requests are considered solicited requests. "The FDA considers requests for off-label information that are prompted in any way by a manufacturer or its representatives to be solicited. Such solicited requests may be considered evidence of a firm's intent that a drug or medical device be used for a use other than that specifically approved or cleared by the FDA."

256. In 2012 Vollman gave a presentation entitled "Bugs-Be-Gone: Source Control in the ICU," which included slides promoting "Daily CHG Bathing with 2% Cloths to Reduce CLA-BSI," "The Efficacy of Daily Bathing with Chlorhexidine for Reducing Healthcare-Associated Bloodstream Infections," "2% CHG Cloth vs. Soap & Water Bathing for Reduction of HAIs in Med-Surg," "VRE & MRSA: Colonization Reduction with 2% CHG cloth," the "Effect of CHG Cloth Bath of HAIs in Trauma Patients," stating that "2% prep cloth more effective in reducing bacterial load than 4% CHG solution that must be rinsed off," "CHG Daily Bath Reduces MRSA Bacteremia," and "CHG Bathing Reduces CLA-BSIs" and encouraging medical professionals and hospitals to "utilize daily 2% CHG

cloths for cleansing at night in any patient with a central line or foley catheter." One of the slides in this presentation specifically mentions "Sage 2% CHG cloths" by name in promoting the benefits of daily bathing the entire body with CHG cloths to prevent hospital-acquired infections. The presentation also includes slides promoting use of CHG oral rinse for the prevention or reduction of VAP and stating that "oral care compliance," which includes the use of CHG oral rinse, and "use of the ventilator bundle resulted in a 89.7% reduction in VAP."

257. On May 15, 2013, Vollman gave a Webinar presentation entitled, "What Else Can I Do? Evidence Based Bathing to Impact Outcomes," which included slides promoting the use of 2% CHG cloths for daily bathing of the entire body. The slides in this presentation promote "Daily CHG Bathing with 2% cloths to Reduce CLA-BSIs," "the Efficacy of Daily Bathing with Chlorhexidine for Reducing Healthcare-Associated Bloodstream Infections" and the "Impact of 2% CHG Cloth Baths" and "daily bathing with CHG" as the "best method for reducing spread of MRSA & MDROs" and "incidence of CLABSI." The slides state that "CHG Bathing Reduces CLA-BSIs" and recommends that medical professionals and hospitals "bathe patients daily" using "2% CHG cloths from jawline down," "use 2% CHG cloths for routine bathing of all ICU patients" from the jawline down, "consider routing bathing with 2% CHG cloths for all acute care patients with a central line and bone marrow transplant patients" and "ensure 2% CHG is on the skin at all times." One of the slides in this presentation specifically mentions "Sage 2% CHG cloths" by name in promoting the benefits of daily bathing the entire body with CHG cloths to prevent hospital-acquired infections.

258. Another one of Sage Products' paid speakers is Allan Morrison, a physician in Washington, D.C. In 2011 Dr. Morrison gave a presentation entitled "Infection Control 2011: Better Living Through Chemistry," which included slides promoting daily bathing with CHG cloths in the ICU to prevent hospital-acquired infections. Dr. Morrison gave basically the same presentation in 2012 and again

56

1  presented slides promoting daily bathing of the entire body with CHG cloths in the
2  ICU to prevent hospital-acquired infections.

### O. Sage's Improper Influence on Studies, Guidelines and Standards of Care

5  259.  Sage is the only pharmaceutical company that sells 2% CHG Cloths in
6  the United States.

7  260.  Sage Products also devotes a considerable amount of resources to
8  influence Clinical Studies, Standards of Care and Guidelines via their paid
9  speakers or Key Opinion (or Thought) Leaders.

10  261.  By way of example, in April 2013 the American Academy of Critical-
11  care Nurses ("AACN") issued a Practice Alert entitled "Bathing the Adult Patient."
12  Kathleen Vollman, one of Sage's paid speakers, was one of the main contributors
13  of the Practice Alert, which stated that daily bathing of the entire body with pre-
14  packaged CHG cloths should be the standard of care for all patients. The Practice
15  Alert specifically states, "Based on the latest available evidence, the expected
16  practice related to bathing adult patients includes: ... Bathe patients daily using a
17  disposable cloth that is prepackaged with a 2 percent solution of chlorhexidine
18  gluconate (CHG). Use of CHG is associated with significant reductions in
19  colonization of specific bacteria and infections with multidrug-resistant
20  organisms."

21  262.  The April 2013 Practice Alert was posted on the AACN website
22  (www.aacn.org) but is no longer available there. The AACN website states, "Were
23  you looking for the AACN Practice Alert™ on bathing the adult patient? This alert
24  is temporarily out of circulation while AACN and other organizations collaborate
25  to more closely align the information for use in clinical practice."

26  263.  The April 2013 Practice Alert of the AACN was accompanied by a
27  webinar given by Vollman to hundreds of critical care nurses and leaders.

28

**CASE NO. 11-CV-2975-WQH(JMA)**

1    Vollman's webinar was entitled "Evidence vs. Tradition: Examining the Science of
2    Bathing Critically Ill Adults."

3         264.  The Practice Alert and Vollman's webinar were picked up and
4    reported on by many news publications, resulting in effective advertising for Sage
5    of its Pre-Surgical 2% CHG Cloths for the off-label daily bathing of the entire
6    body to prevent hospital-acquired infections.

7         265.  Vollman also has several ties, including appointed positions, to
8    federal and state boards where she is in a position to influence recommended
9    standards of care.

10        266.  For example, from 1997-2000, Vollman was "Clinical Nursing
11   Representation" for the NHLBI (the National Heart Lung and Blood Institute),
12   which is an HHS, NIH federal entity.

13        267.  In 2010, Vollman gave a presentation to the American Association of
14   Critical Care-Nurses National Teaching Institute and Critical Care Exposition in
15   2010 in DC entitled, "Doing it Right:  ARDS/ALI ("Acute Respiratory Distress
16   Syndrome"/"Acute Lung Injury") Evidence-Based Care Saves Lives."

17        268.  From 2010 to the present, Vollman is and has been an appointed
18   member of the Task Force for Nursing Practice at the Michigan Department of
19   Community Health in East Lansing, Michigan.

20        269.  From 2009 to the present, Vollman is and has been part of the APRN
21   ("Advanced Practice Registered Nurses") Coalition, Michigan Certified Nurse
22   Practitioner, which influences Michigan's Public Health Code.

23        270.  From 2009 to the present, Vollman is and has been appointed to serve
24   as the President of the Michigan Association of Clinical Nurse Specialists.

25        271.  From 2004-2007, Vollman served as Co-Chair of the Surviving Sepsis
26   Campaign for the State of Michigan, Michigan Society of Critical Care Medicine.

27        272.  From 2001-2002, Vollman was an appointed Board Director for the
28   National Association of Clinical Nurse Specialists Foundation and has also held

1 positions with the National Association of Clinical Nurse Specialists and the
2 Society of Critical Care Medicine.

3    273.  From 1999 to 2001, Vollman was appointed to serve in the AACN
4 ("American Association of Critical Care Nurses") Advance Practice Work Group
5 that developed the scope and practice standards for the acute and critical care
6 Clinical Nurse Specialists.  AACN sets the bar for ICU care, oral care and patient
7 hygiene.

8    274.  From 2000 to the present, Vollman has served on the Editorial Board
9 for the American Journal of Critical Care.

10    275.  Upon information and belief, Vollman used her influence to have 2%
11 CHG Cloths and CHG Oral Rinse (neither of which have direct competitors)
12 recommended as standards of care at a federal (national) level and at a state level.

13    276.  Sage Products influenced their Key Opinion Leaders (or Thought
14 Leaders) in their Clinical Trials by granting them free products for their studies and
15 also by providing free on-site training by the CSL team on daily bathing the entire
16 body with CHG cloths to nursing staffs of hospitals connected with the studies.

17    277.  By way of example, Susan Huang, a physician in California,
18 conducted a study on CHG daily bathing called "Targeted versus Universal
19 Decolonization to Prevent ICU Infection," which ultimately was published in the
20 New England Journal of Medicine in 2013. In advance of her study, Dr. Huang
21 agreed with Sage to release her study protocol as a deliverable in exchange for
22 receiving free 2% CHG Pre-Surgical cloths from Sage Products during the study.
23 The study protocol, entitled "Universal ICU Decolonization: An Enhanced
24 Protocol," was posted by the AHRQ on their website (www.ahrq.gov). Dr.
25 Huang's agreement to release her study protocol in this way was advantageous to
26 Sage Products because customers and prospective customers could then implement
27 CHG daily bathing of the entire body in their hospitals easily with the protocol. Dr.

28

1 Huang's receipt of free products from Sage in exchange for her release of her study
2 protocol was not disclosed anywhere in her study or on the AHRQ website.

3      278.   Since it was posted on the AHRQ website, Director Ryan instructed
4 Relator's Off-Label Team to stop using its standard training tools and simply send
5 the AHRQ link or direct customers to the AHRQ website. Ryan never disclosed to
6 the Team that Sage had made this a deliverable expectation of Dr. Huang's study.

7      279.   In a subsequent study by Dr. Huang, Sage has again provided free
8 product for use in her study. That study is being funded by both the NIH and CDC.
9 In addition to providing free product for Dr. Huang's study, Sage provided free
10 training on daily bathing with CHG cloths for all sites used in her study. Sage
11 required its CSL liaison group, of which Relator was a member, to train all study
12 sites to ensure the off-label use of Sage's CHG cloths was not only understood by
13 staff at those sites but also accepted as the more convenient method to bathe the
14 patient's entire body, especially since the study would have an alternative product
15 available, *i.e.*, liquid CHG soap. That alternative product did not have any
16 representation at the study site trainings, meaning Sage's CHG cloths were the
17 main focus in Dr. Huang's study. This was tremendously beneficial to Sage. Sage
18 also provided funding and resources to produce a video filed at Sage's simulation
19 lab with actors paid by Sage to facilitate the use of Sage's 2% CHG cloths during
20 Dr. Huang's study.

21      280.   Another study for which Sage Products provided all training to study
22 sites was a pediatric CHG daily bathing study led by Dr. Danielle Zerr, a physician
23 in Seattle, Washington. The study was entitled, "Impact of Daily Bathing with
24 Chlorhexidine Impregnated Cloths on Nosocomial Infections in the Pediatric
25 Intensive Care Unit." Relator was instructed by Sage's Research Coordinator Katie
26 Woznick to meet with Dr. Zerr and her study coordinator on November 28, 2012,
27 and to discuss with them CHG daily bathing, share Sage's training tools and
28 engage in any relevant clinical conversations that developed with Dr. Zerr during

the meeting. Woznick and the Research Division reported to Sage's Marketing group at the time. Unlike Dr. Huang, Dr. Zerr disclosed in her study that "Grantor Sage Products" awarded $100,000 toward the study on September 1, 2009.

281.   Another recipient of funds and free product was Alexis Elward who used the funds and free product from Defendant to conduct studies on chlorhexidine bathing in pediatric ICUs.

282.   Sage Products freely gave its CHG daily bathing presentation materials, handouts and protocol sheets to customers who were giving their own CHG daily bathing presentations for public events or educational events at their hospitals. Sage knew when it gave its customers these materials containing information about the off-label use of its Pre-Surgical 2% CHG cloths that the customers intended to use the information to promote the off-label use.

283.   As a result of all of the foregoing, physicians and medical professionals from at least 2008 to the present have been induced to use Sage's Pre-Surgical 2% CHG Cloths for daily bathing the entire body and CHG Rx Q*Care Oral Rinse for off-label uses. Thousands of claims for reimbursement for off-label uses of Sage's Pre-Surgical 2% CHG cloths for daily bathing of the entire body and CHG Rx Q*Care oral rinse were submitted to and paid by Medicaid, Medicare, TRICARE, CHIP and other government-funded plans.

**P. Sage Products' Payment of Remuneration to Induce or Reward The Generation of Business Involving Drugs Reimbursed by Government-Funded Healthcare Programs**

284.   In addition to paying investigators and key opinion (or thought) leaders to promote off-label orders and prescriptions, Sage Products also paid money to and gave other remuneration to Dr. Susan Huang, Kathleen Vollman, RN, Dr. Allan Morrison, large health systems including Banner Health and Kaiser Permanente, and other hospitals, children's hospitals, doctors and investigators to induce the submission of charges for Pre-Surgical 2% CHG Cloths and Rx Q*Care

61

1  CHG Oral Rinse to Medicaid, Medicare, CHIP, TRICARE and other government-
2  funded plans for reimbursement.

3      285.   Specifically, Sage gives each of its customers free Cloth warmers
4  valued at approximately $2,000 each to induce customers to place orders and/or
5  write prescriptions that are reimbursed in whole or in part by Medicaid, Medicare,
6  CHIP, TRICARE and other government-funded plans.   If a customer does not
7  continue to order Sage's CHG Cloths, the warmer is taken away by Sage.

8      286.   Sage also gives each of its customers thousands of dollars of free
9  product – Pre-Surgical 2% CHG Cloths and Rx Q*Care CHG Oral Rinse – for
10  several weeks to induce customers to place orders and/or write prescriptions that
11  are reimbursed in whole or in part by Medicaid, Medicare, CHIP, TRICARE and
12  other government-funded plans.

13      287.   Sage also gives large accounts like Banner Health and Kaiser
14  Permanente per-unit rebates tied to large purchases for both Pre-Surgical 2% CHG
15  Cloths and Rx Q*Care CHG Oral Rinse to induce these accounts to buy more
16  product that are reimbursed in whole or in part by Medicaid, Medicare, CHIP,
17  TRICARE and other government-funded plans.

18      288.   Sage pays money and gives thousands of dollars of free product and
19  free use of Sage personnel to perform in-service training at off-label study
20  participants sites to Dr. Susan Huang, Kathleen Vollman, RN, and Dr. Allan
21  Morrison to induce them to induce others to purchase or order off-label Pre-
22  Surgical 2% CHG Cloths and off-label Rx Q*Care CHG Oral Rinse, which is
23  reimbursed in whole or in part by Medicaid, Medicare, CHIP, TRICARE and other
24  government-funded plans.

25      289.   Sage pays this remuneration to induce orders and prescriptions and
26  knowingly fails to submit Transparency Reports, as required by the Patient
27  Protection And Affordable Care Act, commonly referred to as the Sunshine Act
28  (42 CFR § 403).

## Q. Sage Products' Retaliatory Treatment and Termination of Relator

290.  As noted above, Relator worked for Sage Products as a CSL for Sage's West Coast Territory between August 19, 2011, and April 14, 2014. When she first started, Relator's direct supervisor was Ronald Chappuis, Director - Medical Science Liaison for Sage's West Coast Territory.

291.  Following her hire date, Relator reported numerous incidents to Chappuis concerning Sage Product's handling of CHG off-label requests that she believed to be in violation of FDA regulations. Relator's good-faith complaints to Sage Products include, but are not limited to, complaints about the following:

a.  Relator was frequently asked by Sage Products' Sales Representatives to discuss or promote the off-label application of Pre-surgical 2% CHG Cloths without an unsolicited request;

b.  Relator was frequently asked by Sage Products to reach out to customers who did not solicit information regarding CHG off-label uses;

c.  Relator was told on numerous occasions by Sage Products' Sales Representatives in her territory that Sage allowed them (the Sales Representatives) to give customers off-label studies to market the off-label application of daily bathing in the past, and Relator could tell based on her conversations with Sales Representatives and customers that Sales Representatives continued to directly promote off-label orders to customers;

d.  Relator was told by Sage Products that selling off label was a common practice at Sage Products, with the preceding CSLs all engaging in this practice;

63

e.     Relator and the other CSLs were required to attend and participate in National and Regional Sales Meetings and learn Defendant's selling techniques;

f.     Sage Products implemented a "Paid Speakers Program," which included Key Opinion (or Thought) Leaders, as an improper and illegal marketing tool for off-label business growth; and

g.     Sage Products utilized significant resources to influence applicable guidelines and clinical studies by using its Paid Speakers Program, distributing free products to key investigators for their studies and providing training on off-labels uses by its CSLs.

292.   After Relator reported these aforementioned incidents to Chappuis, he failed and refused to investigate any of Relator's concerns. In fact, Chappuis did not do anything at all in response to Relator's complaints.

293.   Because Chappuis ignored Relator's complaints, she reported the same incidents to Joyce Ryan, then Sage's East Coast CSL. Ryan trained Relator at Sage Products and temporarily served as Relator's mentor. In response to Relator's complaints, Ryan explained that the practices Relator described were commonplace at Sage and were practiced within Ryan's territory as well. As lip service, both Chappuis and Ryan repeatedly told Relator that her role was FDA compliance, not sales or marketing. Relator was confused by this at the time because she believed Sage's conduct that she reported violated FDA regulations with respect to its sales and marketing practices. Moreover, Relator was being pulled into sales and marketing by the Sales Representatives and by her required attendance and participation at Defendant's National and Regional Sales meetings and ongoing sales training.

294.   In or around August 2012, Chappuis was demoted. Ryan thereafter became the Director - Medical Science Liaison for Sage Products, and Relator's new direct supervisor.

295.   Following her complaints to Directors Chappuis and Ryan, which were effectively ignored, Relator continued to discover and observe Sage Products' Sales Representatives engaging in conduct, condoned by Sage, that Relator believed was in violation of FDA regulations.

296.   Relator observed that Sage Products encouraged and condoned its Sales Representatives' unlawful behavior when it came to promoting off-label orders of Pre-Surgical 2% CHG Cloths to customers. In the event a Sales Representative was blatantly caught engaging in such unlawful conduct, Sage Products simply gave an ineffective verbal warning for the unlawful conduct, and did not impose any real disciplinary action.  The promotion of off-label orders by that Sales Representative and others including Sales Representatives and CSLs continued.

297.   While participating in a CSL Team conference call, Relator recommended that Sage Products implement a formal, written process for documenting all noncompliance events or issues. Relator's recommendation was ignored and certainly was never implemented by Sage Products.

298.   Throughout Plaintiff's employment, Paul Hanifl, Founder and Vice President of Sage Products, repeatedly stated on behalf of Sage Products that Sage did not have to comply with FDA regulations or guidelines since Sage was not "selling a medication." Relator did not agree with Hanifl's opinion on this issue. In fact, Relator's job was supposed to be FDA compliance, as confirmed by Chappuis and Ryan.

299.   Throughout the remainder of 2012 and continuing into 2013, Relator continued to report FDA compliance issues to her superiors at Sage Products, to no avail.

CASE NO. 11-CV-2975-WQH(JMA)

300.   As Relator's employment with Sage Products progressed over time, her working relationships with certain Sales Representatives, including but not limited to Jeremy Merriman, David Morse and Rick Orison began to deteriorate because Relator would not participate in their unlawful conduct with respect to sales and marketing of off-label CHG cloths, which Relator believed violated FDA regulations and guidelines. As Relator's working relationships with these representatives worsened, she began to suffer physical, mental and emotional harm due to the severe stress she experienced at work.

301.   In January 2013, Relator communicated with Ryan, her supervisor and the Medical Science Liaison Director, via e-mail regarding a Sage Products Sales Representative's e-mail communication with a customer, which Relator believed violated FDA regulations. Relator sought guidance on how to handle the situation because she did not want to be blamed for the loss of a sale but did want Sage Products to be FDA compliant.

302.   On January 9, 2013, Ryan called Relator to discuss Relator's e-mail communication referenced in the preceding paragraph. Ryan asked Relator to address such issues verbally in the future and she emphasized the importance of not having written communications concerning "compromising issues." Relator then asked for Ryan's help in talking to the Sales Representative about his compromising e-mail with the customer but Ryan refused. Instead, Ryan told Relator to discuss her concerns directly with Todd Kieling, Sales Representative Manager for Sage Products. Relator explained to Ryan that Kieling was already aware of the Sales Representative's improper conduct and appeared to condone it. In response, Ryan stated that if Kieling was already aware of the compromising conversation, then there was nothing more either she or Relator could do about the situation.

303.   On May 6, 2013, Sean Haley, Sage's Vice President of RA/QA, worked with Relator during a business trip. While working together, Haley brought

66

1  up FDA compliance issues at Sage Products on numerous occasions as well as the
2  fact that Relator had made numerous complaints about FDA issues. However,
3  Haley never once asked Relator about any of her specific complaints to Ryan
4  concerning FDA compliance issues, which Relator found to be very odd. Haley's
5  comments were made to made Relator feel uncomfortable for having complained.

6      304.  In or around June 19, 2013, during a breakout session at Sage
7  Products' Regional Meeting, Founder and VP Hanifl again vocalized his opinion
8  that Sage did not have to follow FDA regulations because the 2% CHG Pre-
9  surgical Cloths were not a "medication."

10     305.  During the Regional Meeting, Ryan disclosed to Relator that Sage
11  Products' Executives could track and trend off-label CHG cloth dollars per Sage
12  territory, as well as CSLrequests made. Relator was told by Ryan that Sales
13  Representatives were selling off-label CHG cloths without using a CSL, which
14  Relator believed violated FDA regulations.

15     306.  On September 5, 2013, Relator was subjected to severe harassment by
16  Jeremy Merriman, Sage Products' Sales Representative for Los Angeles, because
17  Relator tried to insist on compliance with FDA regulations. As Relator tried to
18  explain to Merriman that she could not make formal recommendations to
19  customers regarding the off-label use of CHG cloths, Merriman continued to
20  harass and berate Relator. Relator suffered immense distress as a result of
21  Merriman's abuse and harassment.

22     307.  The next day, on September 6, 2013, Merriman called Relator and
23  continued to harass and berate her. He insisted that Relator could recommend and
24  promote the off-label use of products to customers as other CSLs had done in the
25  past. When Relator tried to explain what she was allowed to tell customers under
26  applicable FDA regulations, Merriman argued with Relator and insisted that she
27  sell Shield, a Sage product, regardless of conflicting recommendations or studies.
28  Relator was frustrated and distraught so she asked Merriman to contact his

1 manager, Sales Representative Manager Kieling, regarding their disagreement. In
2 response, Merriman told Relator that Kieling was already aware of the situation
3 and Merriman's opinion before Merriman's call with Relator.

4     308.   That same day, Relator called Ryan and made a complaint of
5 harassment against Merriman due to his abusive, harassing and berating behavior
6 toward her because she was not willing to participate in conduct that violated
7 applicable FDA regulations.

8     309.   On September 8, 2013, Ryan called Relator and asked her to submit a
9 written complaint regarding her recent interaction with Merriman. Relator asked
10 Ryan if Human Resources was involved in her complaint against Merriman. Ryan
11 responded that Relator's written complaint would be provided to Ryan's boss and
12 Human Resources for investigation. Relator complied with Ryan's request and
13 submitted her written complaint that same day.

14     310.   The following week, Relator was ordered to attend an "emergency
15 meeting" with Ryan and Haley, VP of RA/QA, to discuss Relator's written
16 complaint. Relator explained her serious concerns regarding Sage Products' overall
17 failure to comply with FDA regulations as well as the lack of consequences for
18 Sales Representatives' misconduct related to FDA violations and the complete
19 absence of a formal process to report non-compliance events. Relator became so
20 distraught as she discussed her concerns that she broke down in tears. Upon
21 information and belief, Sage Products failed to take any action in response to any
22 of Relator's complaints discussed at this meeting.

23     311.   Immediately following this emergency meeting discussed in the
24 preceding paragraph, Ryan told Relator that she would understand if Relator
25 decided to leave Sage Products. Relator was surprised and worried by Ryan's
26 statement since Relator had not suggested in any manner to anyone at Sage that she
27 was considering leaving the Company. In fact, Relator had no intention of quitting
28 her job because she did not do anything wrong. Relator was simply trying to follow

68

1   the law and do her job to make sure Sage Products was compliant with FDA
2   regulations. Unfortunately, Relator's attempts to keep Sage Products compliant
3   with the law were not popular because Sage Products and its Sales Representatives
4   wanted the off-label sales.

5       312.   Following Relator's emergency meeting with Ryan and Haley, during
6   which she reported Sage's ongoing noncompliance with FDA regulations, Relator
7   continued to be subjected to retaliatory treatment by Sage Products for her
8   protected complaints.

9       313.   Ryan began to set different expectations for Relator compared to other
10   members of her CSL Team. Moreover, Ryan limited her communication with
11   Relator to urgent work matters only, whereas they had previously talked more
12   frequently and had discussed both personal and professional matters.

13       314.   Subsequent to the emergency meeting, Relator was contacted by Pam
14   Allen, Vice President of Human Resources for Sage Products. Allen arranged a
15   telephone conference between Relator, herself and Merriman. When that phone
16   conference occurred, Merriman apologized to Relator for his behavior. Allen asked
17   both Merriman and Relator to keep the conversation confidential. Relator complied
18   with this request. Following this phone conference, Merriman completely avoided
19   Relator. Relator did learn, however, that Merriman's sales of off-label CHG
20   remained high. Relator suspected that Merriman continued to violate FDA
21   regulations, with Sage Products' knowledge, to maintain his high sales.

22       315.   On February 21, 2014, Ryan arranged for Sage Products' CSLs and
23   the administrative team to stay at a beachside resort while attending the Strategic
24   Planning Meeting in Florida. According to Ryan this was in lieu of the CSLs being
25   invited to the President's Circle, which was a prestigious trip for Sage Products'
26   Sales Representatives with the highest sales.  It was to reward the CSL group for
27   their role in the off-label sales growth.

28

CASE NO. 11-CV-2975-WQH(JMA)

316. While Relator was attending the Strategic Planning meeting in Florida, a claim against another company for CHG off-label noncompliance was discussed. Haley, Sage's VP of RA/QA, verbally expressed his disapproval of the whistleblower employee at the other company who reported the noncompliance issues against her employer. Haley's comments made Relator very uncomfortable and fearful about her job security in light of her complaints to Defendant – and Haley's knowledge and previous uncomfortable discussions about Relator's complaints – regarding Sage's noncompliance with FDA regulations.

317. Immediately following the meeting, Relator asked to speak to Haley in private. Relator told Haley that she wanted to clear the air between them because she had not seen him since the emergency meeting. In response, Haley stated everything was "fine," but then commented that in the past if an employee filed a formal complaint against Sage Products, that employee usually left the Company. Relator felt increasingly fearful about her job security with Sage based upon the recent comments by Haley and Ryan and their suggestions that she resign.

318. On March 4, 2014, Relator received her Performance Evaluation from Ryan. Relator was criticized for not controlling her emotions during the emergency meeting with Ryan and Haley, which was not connected to her overall job performance.

319. Prior to her complaints about FDA violations, Relator's performance evaluations had always been positive.

320. On March 25, 2014, Relator had dinner with Dr. Susan Huang and Dr. Edward Septimus, both lead investigators for an upcoming ABATE CHG daily bathing study for the medical surgical population within the Hospital of America healthcare system throughout the nation. During dinner, Relator learned that Dr. Huang had agreed to release the study protocol as a deliverable in exchange for receiving free 2% CHG Pre-surgical Cloths from Sage Products during the study.

CASE NO. 11-CV-2975-WQH(JMA)

1    While this arrangement was beneficial for Sage, it was not included in the
2    disclosure section of the study, creating more FDA compliance issues.

3         321.   On April 3, 2014, Ryan deducted $1,000.00 from Relator's earned
4    bonus pay due to an alleged late submission of Relator's Catalytic Coaching Form.
5    This action by Ryan was clearly retaliatory against Relator since Ryan had not set
6    a specific deadline for submitting the form and then she delayed the actual
7    completion date for the form.

8         322.   On April 4, 2014, Relator filed a formal written complaint for
9    retaliation with Allen, VP of HR, and Haley, VP of RA/QA. Relator reported
10   Ryan's ongoing retaliation against her due to her prior protected complaints and
11   her ongoing reports of off-label noncompliance with the FDA regulations.

12        323.   Immediately following this second formal complaint, Ryan ceased
13   communication with Relator. Consequently, Relator had to communicate with
14   Allen, VP of HR, instead. While Relator discussed work-related issues with Allen,
15   Relator never received a response or update from Allen concerning her April 2014
16   retaliation complaint.

17        324.   On April 13, 2014, Relator received an e-mail from Allen, VP of HR,
18   ordering Relator, who was in San Diego, to a meeting in Los Angeles the
19   following day, which gave Relator less than a 24-hour notice. Relator suffered
20   severe anxiety after receiving Allen's e-mail because she feared further retaliation
21   by Sage Products but still agreed and complied with the request to meet the next
22   day in Los Angeles. Allen then cancelled the meeting and then scheduled a phone
23   conference for Realtor, Allen and Haley for the following afternoon.

24        325.   On April 14, 2014, Relator was fired during her telephone conference
25   with Haley, VP of RA/QA, and Allen, VP of HR. Haley told Relator she was fired
26   because she was unhappy at Sage Products and her behavior with Ryan was
27   unacceptable.

28

**CASE NO. 11-CV-2975-WQH(JMA)**

326. Under 31 U.S.C. §3730(h)(1) of the False Claims Act, "Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."

327. Under 31 U.S.C. §3730(h)(2) of the False Claims Act, "Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection."

## COUNT I:

## Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)

## (Off-Label Marketing)

328. Relator, on behalf of herself and the United States, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

329. Sage Products knowingly, or with deliberate ignorance or reckless disregard, caused false or fraudulent claims for payment to be presented to officials of the United States government, in violation of 31 U.S.C. §3729(a)(1).

330. The claims for payment caused to be submitted by Sage Products include, but are not limited to:

CASE NO. 11-CV-2975-WQH(JMA)

a.    claims to Medicaid from 2005 through the present for reimbursement of costs for Pre-Surgical 2% CHG Cloths for daily bathing for the prevention of hospital-acquired infections and for prescriptions for Rx Q*Care CHG Oral Rinse for the prevention of pneumonia, including the prevention of pneumonia in pediatric patients;

b.    claims to Medicare, TRICARE and other government-funded plans from 2005 through the present for reimbursement of costs for Pre-Surgical 2% CHG Cloths for daily bathing to prevent hospital-acquired infections and for prescriptions for Rx Q*Care CHG oral rinse for the prevention of pneumonia, including the prevention of pneumonia in pediatric patients.

331.   The claims for reimbursement were false for the following reasons:

a.    States will not reimburse claims that result from illegal, off-label marketing and promotion by drug companies in violation of their state plans and policies governing Medicaid reimbursement;

b.    Medicare, TRICARE and other government-funded plans do not permit reimbursement for prescriptions that result from illegal, off-label marketing and promotion by drug companies;

c.    States will not reimburse prescriptions that result from illegal misbranding of drugs in violation of the state plans and policies governing Medicaid reimbursement; and

d.    Medicare, TRICARE and other government-funded plans will not reimbursement prescriptions that result from illegal misbranding of drugs.

332.   By virtue of the acts described above, Sage Products caused false or fraudulent claims to be presented to the United States for payment.

73

333.   By virtue of the acts described above, Sage Products knowingly, or with deliberate ignorance or reckless disregard, made, used, or caused to be made or used false statements, and omitted material facts, to induce the United States to approve and pay such false and fraudulent claims.

334.   Each claim for reimbursement made as a result of Sage Products' illegal marketing practices and illegal inducements represents a false or fraudulent record or statement.  And, each claim for reimbursement for such illegally-induced claims submitted to a federal health insurance program represents a false or fraudulent claim for payment.

335.   The United States, unaware of the falsity of the records, statements and claims made or caused to be made by Sage Products, paid claims that would not have been paid but for Sage Products' illegal off-label marketing practices and illegal inducements to physicians.

336.   By reason of Sage Products' acts, the United States has been damaged in a substantial amount to be determined at trial.

WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendant and in favor of the United States as follows:

     a.     that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this First Amended Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

     b.     that civil penalties of $11,000 be imposed for each and every false claim that Sage Products presented to the United States and/or its grantees;

     c.     that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.   that the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this First Amended Complaint;

e.   that Relator be awarded the maximum amount allowed to her pursuant to the False Claims Act and the state False Claims Acts set forth below;

f.   that Relator be awarded the maximum amount allowed to her of any portion of a judgment or settlement fund that goes to any state government; and

g.   that this Court award such other and further relief as it deems proper.

## COUNT II:

## Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)

## (Knowing Breach of Government Contracts)

337.   Relator, on behalf of herself and the United States, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

338.   From at least 2005 and continuing in the present, Defendant enjoyed lucrative government contracts with Military Treatment Facilities and VA Hospitals throughout the country for Pre-Surgical 2% CHG Cloths and Rx Q*Care CHG Oral Rinse.   During that time, 100% of the contract payments from the government to Sage Products was conditioned upon Sage Products abiding by federal laws and regulations, including those of the FDA.

339.   Defendant failed to abide by federal laws and regulations, including those of the FDA, when it sold Pre-Surgical 2% CHG Cloths and Rx Q*Care CHG Oral Rinse for off-label uses to government-owned healthcare facilities without the required FDA approval.

**CASE NO. 11-CV-2975-WQH(JMA)**

340. Specifically, Sage Products failed to abide by federal laws and regulations, including those of the FDA, when it promoted and continues to promote off label orders for Pre-Surgical 2% CHG Cloths for daily bathing for the prevention of hospital-acquired infections, in contravention of the FDA approved use of Pre-Surgical skin preparation on a limited skin surface area and in contravention of the explicit FDA warning not to use as a general skin cleanser, as outlined in detail above at ¶¶ 45-67, 93-151, 165-182, 239-257.

341. Specifically, Sage Products failed to abide by federal laws and regulations, including those of the FDA, when it provided and continues to provide "free" Cloth warmers (valued at approximately $2,000 each) so that its customers can warm the Pre-Surgical 2% CHG Cloths for bathing of the entire body and instructs customers to store the Cloths in the warmer at temperatures above the FDA-approved temperatures and also to leave the Cloths in the warmer indefinitely, both thereby causing an increased risk of contamination of the Cloths and an increased risk of infection of the patients, as outlined in detail above at ¶¶ 68-70, 152-164.

342. Specifically, Sage Products also failed to abide by federal laws and regulations, including those of the FDA, when it induced government-owned healthcare facilities to contract for and pay more for Pre-Surgical 2% CHG Cloths than less expensive alternative products for daily bathing of patients with off-label claims of daily bathing to prevent hospital-acquired infections, as outlined in detail above in ¶¶ 53, 173.

343. Sage Products failed to abide by federal laws and regulations, including those of the FDA, when it induced government-owned healthcare facilities to contract for and pay for Rx Q*Care CHG Oral Rinse for the prevention of HAP and VAP, contrary to FDA approval, which is limited to the treatment of gingivitis by dentists, and for use on pediatric patients, which is contrary to FDA

76

1  approval and Continuing Nursing Education Guidelines, as outlined in detail above
2  in ¶¶ 71-85, 183-228.

3    344.  Sage Products failed to abide by federal laws and regulations,
4  including those of the FDA, when it paid and continues to pay kickbacks in the
5  form of monetary payments, grant funds, Cloth warmers, per-unit rebates and free
6  products and services to healthcare professionals in exchange for the
7  recommendation, off-label use and off-label prescription of its Pre-Surgical 2%
8  CHG Cloths and Rx Q*Care Oral Rinse, as outlined in detail above in ¶¶ 283-288.

9    345.  Selling non-FDA compliant drugs, using illegal off-label marketing
10  claims to sell drugs to government-owned healthcare facilities and paying
11  kickbacks to healthcare providers was and is an on-going breach of Sage Products'
12  obligations under the regulations and contracts with the Government.

13    346.  Sage Products knew or should have known it was breaching their
14  contracts with the Government.

15    347.  Sage Products submitted or caused to be submitted claims to the
16  United States Government for payment or approval.

17    348.  Such claims were false or fraudulent.

18    349.  Sage Products had actual knowledge, and/or acted in deliberate
19  ignorance of the truth or falsity of the information, and/or recklessly disregarded a
20  risk, that drugs sold with off-label claims were not eligible for remuneration from
21  contracts with government-owned healthcare facilities.

22    350.  Notwithstanding Sage Products' knowledge that the government
23  contracts for Pre-Surgical 2% CHG Cloths and Rx Q*Care CHG Oral Rinse
24  required compliance with FDA rules and regulations, Sage Products knowingly
25  and intentionally took steps to contract with government-owned healthcare
26  facilities (VA Hospitals and military hospitals and other military treatment
27  facilities) for its CHG products and knowingly and intentionally took steps to
28  violate FDA rules and regulations.

351.   If the government-owned healthcare facilities knew that Pre-Surgical 2% CHG Cloths and Rx Q*Care CHG Oral Rinse violated FDA rules and regulations, they would not have contracted and paid for those drugs.   In other words, a condition to payment from the government was Sage Products' compliance with FDA rules and regulations.

352.   Sage Products acted knowingly, either with actual knowledge that it was breaching their government contracts for Pre-Surgical 2% CHG Cloths and Rx Q*Care CHG Oral Rinse (as evidenced by the actions and evidence outlined above in ¶¶ 45 through 288), or in deliberate ignorance or reckless disregard of the truth or falsity of the information.

353.   Every contractual payment by a government-owned healthcare facility for Pre-Surgical 2% CHG Cloths and Rx Q*Care CHG Oral Rinse is a false claim caused by Sage Products for purposes of 31 U.S.C. § 3729 (a)(1).

354.   Pursuant to 31 U.S.C. §§ 3729 (a)(7) and 3730, Sage Products is liable to the United States Government for actual damages, trebled, a civil penalty of not less than $5,500 and not more than $11,000 for each contract payment for a Sage CHG product from a government-owned healthcare facility, plus attorneys' fees and costs.   The highest possible penalties are appropriate in this case in light of the actual knowledge of Defendant that it was breaching its government contracts. The highest possible penalties are also appropriate in this case to send a message to Sage Products' industry (the pharmaceutical industry) that they must abide by federal laws.

WHEREFORE, Relator respectfully requests that the Court enter judgment against Sage Products and in favor of the United States as follows:

          a.    that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this First Amended

Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

b.   that civil penalties of $11,000 be imposed for each and every false claim that Sage Products presented to the United States and/or its grantees;

c.   that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.   that the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this First Amended Complaint;

e.   that Relator be awarded the maximum amount allowed to her pursuant to the False Claims Act and the state False Claims Acts set forth below;

f.   that Relator be awarded the maximum amount allowed to her of any portion of a judgment or settlement fund that goes to any state government; and

g.   that this Court award such other and further relief as it deems proper.

## COUNT III:

## Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)

## (Illegal Kickbacks)

355.   Relator, on behalf of herself and the United States, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

356.   Sage Products paid money and/or gave CHG Cloth warmers valued at $2,000, free product, per unit rebates and/or other things of value and/or other remuneration to Dr. Susan Huang, Kathleen Vollman, RN, Dr. Allan Morrison,

79

large health systems including Banner Health and Kaiser Permanente, and other hospitals, children's hospitals, doctors and investigators to induce or reward the generation of business involving drugs reimbursed by government-funded healthcare programs, including the submission of charges for Pre-Surgical 2% CHG Cloths and Rx Q*Care CHG Oral Rinse to Medicaid, Medicare, TRICARE, CHIP and other government-funded plans for reimbursement.

357. Under 42 U.S.C. § 1320a-7b(b), whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,500 or imprisoned for not more than five years, or both.

358. Sage Products submitted or caused to be submitted claims to the United States Government for payment or approval.

359. Such claims were false or fraudulent.

360. Sage Products had actual knowledge, and/or acted in deliberate ignorance of the truth or falsity of the information, and/or recklessly disregarded a risk that charges to the government for Pre-Surgical 2% CHG Cloths were as a result of illegal kickbacks and were not eligible for reimbursement from government-funded healthcare plans.

361. Every charge for Pre-Surgical 2% CHG Cloths and Rx Q*Care CHG Oral Rinse caused by Sage Products' illegal kickbacks and submitted to

Government-Funded Plans for reimbursement is a false claim caused by Sage Products for purposes of 31 U.S.C. § 3729 (a)(1).

362. Pursuant to 31 U.S.C. §§ 3729 (a)(7) and 3730, Sage Products is liable to the United States Government for actual damages, trebled, a civil penalty of not less than $5,500 and not more than $11,000 for each charge for Pre-Surgical 2% CHG pre-surgical cloths and Rx Q*Care CHG Oral Rinse caused by illegal kickbacks and reimbursed by a Government-Funded Plan, plus attorneys' fees and costs. The highest possible penalties are appropriate in this case in light of Sage Products' actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Sage Products' industry (the pharmaceutical industry) that they must abide by federal laws.

WHEREFORE, Relator respectfully requests that the Court enter judgment against Sage Products and in favor of the United States as follows:

      a.     that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this First Amended Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

      b.     that civil penalties of $11,000 be imposed for each and every false claim that Defendant Sage Products presented to the United States and/or its grantees;

      c.     that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

      d.     that the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this First Amended Complaint;

81

e.   that Relator be awarded the maximum amount allowed to her pursuant to the False Claims Act and the state False Claims Acts set forth below;

f.   that Relator be awarded the maximum amount allowed to her of any portion of a judgment or settlement fund that goes to any state government; and

g.   that this Court award such other and further relief as it deems proper.

## COUNT IV:

### Retaliatory Treatment and Termination of Relator in Violation of 31 U.S.C. §3730(h) of the False Claims Act

### (On Behalf of Relator Cindy V. Salgado Only)

363.   Relator incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

364.   At all times pertinent to this First Amended Complaint, and as outlined above, Relator knew and/or reasonably believed to be true that Sage Products' marketing of its Pre-Surgical 2% CHG Cloths for the off-label use of daily bathing was in violation of the federal False Claims Act.

365.   At all times pertinent to this First Amended Complaint, and as outlined above, Relator, through lawful acts, took efforts to oppose or stop these reasonably-believed violations or potential violations of the federal False Claims Act and, as such, participated in protected activities.

366.   In addition, at all times pertinent to this First Amended Complaint and as outlined above, there existed internal company documents, to which Relator lawfully had access, that would likely constitute evidence of false claims if they were submitted to the Government.

367.  As outlined above, Sage Products knew that Relator participated in these protected activities and opposed Sage Products' violations or potential violations of the federal False Claims Act.

368.  As outlined above, Relator was fired by Sage Products 10 days after her second formal written complaint was lodged with Sage. Prior to her retaliatory termination, and as outlined above, Relator had been subjected to retaliatory treatment and harassment by Sage Products for many months.

369.  Because of Relator's participation in these protected activities and opposition to Sage Products' violations or potential violations of the federal False Claims Act, Sage Products harassed, discharged and otherwise discriminated against Relator in the terms and conditions of her employment, as described above, all in violation of 31 U.S.C. § 3730(h).

370.  As a proximate result of Sage Products' retaliatory harassment and discharge of Relator, Relator has been harmed in that Relator has suffered and will continue to suffer actual, consequential, and incidental financial losses, including without limitation loss of income, salary, commissions and benefits, and the intangible loss of employment-related opportunities for growth in her field and damage to her professional reputation, all in an amount according to proof at the time of trial.

371.  As a proximate result of Sage Products' retaliatory harassment and discharge of Relator, Relator has suffered and continues to suffer anxiety, worry, embarrassment, humiliation, mental anguish, and emotional distress. Relator is informed and believes and thereon alleges that she will continue to experience emotional distress from Sage's retaliatory harassment and discharge for a period of time in the future she cannot presently ascertain. Relator has suffered past, present and future damages in an amount to be shown according to proof at the time of trial.

1    372.   Relator is entitled to liquidation or doubling of her damages as a result

2   of Sage's violation of 31 U.S.C. § 3730(h).

3       WHEREFORE, Relator prays for judgment against Sage Products, as

4   follows:

        a.    For past and future lost wages, income and benefits, and other

           monetary relief according to proof at trial;

        b.    For double the amount of back pay and interest on back pay;

        c.    For special damages, including but not limited to emotional distress damages according to proof at trial;

        d.    For general damages according to proof at trial;

        e.    For costs of suit herein incurred;

        f.    For prejudgment interest on all amounts claimed;

        g.    For attorneys' fees and costs herein incurred; and

        h.    For such other and further relief as the court deems proper.

## COUNT V:

## Wrongful Termination in Violation of California Whistleblower Protection Act, California Labor Code § 1102.5, as amended

### (On Behalf of Relator Cindy V. Salgado Only)

373.   Relator incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

374.   As outlined above, Relator, through lawful acts, took efforts to oppose or stop violations or potential violations of the federal and state statutes, rules and regulations.

375.   Based on Relator's internal complaints, disclosures and opposition to reasonably perceived FDA violations, Sage Products believed that Relator had disclosed or might disclose these violations and/or reasonably believed violations to a person with authority over Relator or to an employee with authority to investigate, discover or correct the violations.

CASE NO. 11-CV-2975-WQH(JMA)

376. Sage Products believed that Relator had disclosed or might disclose these violations and/or potential violations to a governmental agency.

377. As outlined above, Relator opposed and refused to continue to participate in these violations and/or potential violations.

378. As outlined above, Relator had reasonable cause to believe that the information disclosed a violation of state and/or federal statutes, rules or regulations.

379. As outlined above, Sage Products harassed and then discharged Relator.

380. Relator's disclosure or potential disclosure of information and refusal to participate in the violations and/or potential violations was a contributing factor in Sage Products' harassment and termination of her.

381. Relator was harmed and Sage Products' conduct was a substantial factor in causing Relator's harm.

382. Sage Products' conduct, as outlined above, violates California Labor Code section 1102.5, as amended.

383. Throughout Relator's employment and even after Sage terminated her employment, Sage required Relator to abide by a Non-Disclosure Agreement, which prevented the disclosure of confidential information about Sage and effectively prevented disclosure of reasonably-believed violations of federal, state or local laws. In addition, at the time Sage fired Relator, Sage provided Relator with a proposed severance agreement captioned "Agreement and General Release ('Agreement')." In it, Sage offered Relator money in exchange for her affirmation that she had not divulged any confidential information of Sage and for her agreement to "continue to keep confidential such information consistent with the Company's policies, Non-Disclosure Agreement or applicable law." Sage was attempting to prevent Relator's disclosure of reasonably-believed violations of federal, state or local laws.

384.  Sage's rule, regulation and/or policy that prevented Relator's disclosure of reasonably-believed violations of federal, state or local laws, rules or regulations is unlawful under California Labor Section §1102.5, as amended.

385.  The above-recited actions of Sage Products were done with malice and oppression and in reckless disregard of Relator's rights under California law, in that Sage Products engaged in such despicable conduct in order to cause injury to Relator and to subject Relator to cruel and unjust hardship in conscious disregard of her rights.

386.  Moreover, Sage Products, and each of its acts and omissions in continuing, confirming, and ratifying said conduct, were done with the knowledge that Relator's emotional distress would thereby increase, and with a wanton and reckless disregard of the consequences to Relator. Thus, an award of punitive damages in an amount to be determined at trial is justified against Sage Products.

WHEREFORE, Relator prays for judgment against Sage Products, as follows:

a.  For past and future lost wages, income and benefits, and other monetary relief according to proof at trial;

b.  For special damages, including but not limited to emotional distress damages according to proof at trial;

c.  For the maximum penalties allowed by law;

d.  For general damages according to proof at trial;

e.  For attorneys' fees and costs of suit herein incurred;

f.  For prejudgment interest on all amounts claimed; and

g.  For such other and further relief as the court deems proper.

CASE NO. 11-CV-2975-WQH(JMA)

1

## COUNT VI:

## Wrongful Termination in Violation of Public Policy

### (On Behalf of Relator Cindy V. Salgado Only)

387.   Relator incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

388.   The FDA is responsible for protecting the public health by assuring that, among other things, human drugs and medical devices intended for human use are safe and effective.

389.   California Labor Code sections 1102.5(b), as amended, which provides "whistleblower" protection from retaliation to employees who disclose certain violations of state and federal law, reflects the broad public policy interest in California in encouraging employees to report workplace activity that may violate important public policies that the Legislature has stated. California's whistleblower statute includes administrative regulations as a policy source for reporting an employer's wrongful acts and grants employees protection against retaliatory termination. Accordingly, Sage Products' retaliatory conduct against Relator, described above, violated a fundamental and substantial public policy of the State of California.

390.   As a proximate result of the wrongful acts of Sage Products, Relator has been harmed in that Relator has suffered and will continue to suffer actual, consequential, and incidental financial losses, including without limitation loss of income, salary, commissions and benefits, and the intangible loss of employment-related opportunities for growth in her field and damage to her professional reputation, all in an amount according to proof at the time of trial.

391.   As a proximate result of the wrongful acts of Sage Products, Relator has suffered and continues to suffer anxiety, worry, embarrassment, humiliation, mental anguish, and emotional distress. Relator is informed and believes and thereon alleges that she will continue to experience emotional distress for a period

of time in the future she cannot presently ascertain. Relator has suffered past, present and future damages in an amount to be shown according to proof at the time of trial.

392.   The above-recited actions of Sage Products were done with malice and oppression, and in reckless disregard of Relator's rights under California law, in that Sage Products engaged in such despicable conduct in order to cause injury to Relator and to subject Relator to cruel and unjust hardship in conscious disregard of her rights.

393.   Moreover, Sage Products, and each of its acts and omissions in continuing, confirming, and ratifying said conduct, were done with the knowledge that Relator's emotional distress would thereby increase, and with a wanton and reckless disregard of the consequences to Relator. Thus, an award of punitive damages in an amount to be determined at trial is justified against Sage Products.

WHEREFORE, Relator prays for judgment against Sage Products, as follows:

a.   For past and future lost wages, income and benefits, and other monetary relief according to proof;

b.   For special damages, including but not limited to emotional distress damages according to proof at trial;

c.   For general damages according to proof at trial;

d.   For punitive damages;

e.   For costs of suit herein incurred;

f.   For prejudgment interest on all amounts claimed; and

g.   For such other and further relief as the court deems proper.

CASE NO. 11-CV-2975-WQH(JMA)

## COUNT VII:

## Violation of State Law: Arkansas Medicaid Fraud Claims Act

394.  Relator, on behalf of herself and the State of Arkansas, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

395.  Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

396.  Medicaid is jointly funded by the federal and state governments.

397.  Defendant submitted or caused to be submitted claims to the Arkansas Medicaid and/or other government-funded system for payment or approval.

398.  Pursuant to the Arkansas Medicaid Fraud False Claims Act, codified at Ark. Stat. Ann. § 20-77-901, *et seq.*, Defendant are liable to the United States/State of Arkansas for three times the amount of damages that the United States/State of Arkansas sustained, costs of the action and a penalty of not less than $5,500 and not more than $11,000 for each false claim. The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of Arkansas as follows:

> a.      that the United States/State of Arkansas be awarded damages in the amount of three times the damages sustained by the United States/State of Arkansas because of the false claims alleged within this First Amended Complaint;

CASE NO. 11-CV-2975-WQH(JMA)

b.    that civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States/State of Arkansas and/or its grantees;

c.    that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.    that the Court grant permanent injunctive relief to prevent any recurrence of the Arkansas Medicaid Fraud False Claims Act for which redress is sought in this First Amended Complaint;

e.    that the Relator be awarded the maximum amount allowed to her pursuant to the Arkansas Medicaid Fraud False Claims Act; and

f.    that this Court award such other and further relief as it deems proper.

## COUNT VIII:

### Violation of State Law:  California False Claims Act

399.   Relator, on behalf of herself and the State of California, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

400.   Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

401.   Medicaid is jointly funded by the federal and state governments.

402.   Defendant submitted or caused to be submitted claims to the California Medicaid system (also known as "MediCal") and/or other state-funded system for payment or approval.

90

403.   Pursuant to the California False Claims Act, codified at California Government Code § 12650, *et seq.*, Defendant are liable to the United States/State of California for three times the amount of damages that the United States/State of California or political subdivision sustained, costs of the action and a penalty of up to $11,000 for each false claim.  The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.  The amount in controversy here exceeds $500.

WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendant and in favor of the United States/State of California as follows:

    a.    that the United States/State of California be awarded damages in the amount of three times the damages sustained by the United States/State of California because of the false claims alleged within this First Amended Complaint;

    b.    that civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States/State of California and/or its grantees;

    c.    that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

    d.    that the Court grant permanent injunctive relief to prevent any recurrence of the California False Claims Act for which redress is sought in this First Amended Complaint;

    e.    that the Relator be awarded the maximum amount allowed to her pursuant to the California False Claims Act; and

    f.    that this Court award such other and further relief as it deems proper.

CASE NO. 11-CV-2975-WQH(JMA)

## COUNT IX:

### Violation of State Law:  Colorado Medical Assistance Act

404.   Relator, on behalf of herself and the State of Colorado, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

405.   Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

406.   Medicaid is jointly funded by the federal and state governments.

407.   Defendant submitted or caused to be submitted claims to the Colorado Medicaid system and/or other government-funded system for payment or approval.

408.   Pursuant to the Colorado Medical Assistance Act, codified at CO. STAT. §§ 25.5-4-101, 25.5-4-304, et seq., Defendant are liable to the United States/State of Colorado for full restitution, two times the amount of damages that the United States/State of Colorado sustained and a civil penalty of $5,500 for each false claim, costs of the action and attorneys' fees. The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of Colorado as follows:

        a.     that the United States/State of Colorado be awarded damages in the amount of two times the damages sustained by the United States/State of Colorado because of the false claims alleged within this First Amended Complaint;

b.  that civil penalties of $5,500 for each and every false claim that Defendant presented to the United States/State of Colorado and/or its grantees;

c.  that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.  that the Court grant permanent injunctive relief to prevent any recurrence of the Colorado Medical Assistance Act for which redress is sought in this First Amended Complaint;

e.  that the Relator be awarded the maximum amount allowed to her pursuant to the Colorado Medical Assistance Act; and

f.  that this Court award such other and further relief as it deems proper.

## COUNT X:

### Violation of State Law:  Connecticut Health Insurance Fraud Act

409.  Relator, on behalf of herself and the State of Connecticut, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

410.  Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

411.  Medicaid is jointly funded by the federal and state governments.

412.  Defendant submitted or caused to be submitted claims to the Connecticut Medicaid system and/or other government-funded system for payment or approval.

413.  Pursuant to the Connecticut False Claims Act and/or Health Care False Claims Act and/or Health Insurance Fraud Act, codified at Conn. Stat. Ann.

§§17b-301a, *et seq.* and/or §§ 53-440, *et seq.*, Defendant are liable to the United States/State of Connecticut for three times the amount of damages that the United States/State of Arkansas sustained, costs of the action and a penalty of not less than $5,500 and not more than $11,000 for each false claim. The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of Connecticut as follows:

a.   that the United States/State of Connecticut be awarded damages in the amount of three times the damages sustained by the United States/State of Connecticut because of the false claims alleged within this First Amended Complaint;

b.   that civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States/State of Connecticut and/or its grantees;

c.   that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.   that the Court grant permanent injunctive relief to prevent any recurrence of the Connecticut False Claims Act and/or Health Care False Claims Act and/or Health Insurance Fraud Act for which redress is sought in this First Amended Complaint;

e.   that the Relator be awarded the maximum amount allowed to her pursuant to the Connecticut False Claims Act and/or Health Care False Claims Act and/or Health Insurance Fraud Act; and

94

f.    that this Court award such other and further relief as it deems proper.

## COUNT XI:

### Violation of State Law:  Delaware False Claims and Reporting Act

414.  Relator, on behalf of herself and the State of Delaware, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

415.  Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

416.  Medicaid is jointly funded by the federal and state governments.

417.  Defendant submitted or caused to be submitted claims to the Delaware Medicaid system and/or other government-funded system for payment or approval.

418.  Pursuant to the Delaware False Claims and Reporting Act, codified at Del. Code Ann. tit. 6, § 1201, *et seq.*, Defendant are liable to the United States/State of Delaware for three times the amount of damages that the United States/state government sustained, costs of the action and a penalty of not less than $5,500 and not more than $11,000 for each false claim. The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendant and in favor of the United States/State of Delaware as follows:

a.    that the United States/State of Delaware be awarded damages in the amount of three times the damages sustained by the United States/State of Delaware because of the false claims alleged within this First Amended Complaint;

95

b. that civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States/State of Delaware and/or its grantees;

c. that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d. that the Court grant permanent injunctive relief to prevent any recurrence of the Delaware False Claims and Reporting Act for which redress is sought in this First Amended Complaint;

e. that the Relator be awarded the maximum amount allowed to her pursuant to the Delaware False Claims and Reporting Act; and

f. that this Court award such other and further relief as it deems proper.

## COUNT XII:

## Violation of District of Columbia False Claims Act

419. Relator, on behalf of herself and the District of Columbia, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

420. Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

421. Medicaid is jointly funded by the federal and state governments.

422. Defendant submitted or caused to be submitted claims to the District of Columbia Medicaid system and/or other government-funded system for payment or approval.

CASE NO. 11-CV-2975-WQH(JMA)

423.   Pursuant to the District of Columbia False Claims Act, codified at D.C. Code Ann. § 2-308.03, *et seq.*, Defendant are liable to the United States/District of Columbia for three times the amount of damages that the United States/District of Columbia sustained, costs of the action and a penalty of not less than $5,500 and not more than $11,000 for each false claim. The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/District of Columbia as follows:

a.   that the United States/District of Columbia be awarded damages in the amount of three times the damages sustained by the United States/District of Columbia because of the false claims alleged within this First Amended Complaint;

b.   that civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States/District of Columbia and/or its grantees;

c.   that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.   that the Court grant permanent injunctive relief to prevent any recurrence of the District of Columbia False Claims Act for which redress is sought in this First Amended Complaint;

e.   that the Relator be awarded the maximum amount allowed to her pursuant to the District of Columbia False Claims Act; and

f.   that this Court award such other and further relief as it deems proper.

CASE NO. 11-CV-2975-WQH(JMA)

## COUNT XIII:

### Violation of State Law:  Florida False Claims Act

424.   Relator, on behalf of herself and the State of Florida, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

425.   Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

426.   Medicaid is jointly funded by the federal and state governments.

427.   Defendant submitted or caused to be submitted claims to the Florida Medicaid system and/or other government-funded system for payment or approval.

428.   Pursuant to the Florida False Claims Act, codified at Fla. Stat. § 68.081, *et seq.*, Defendant are liable to the United States/State of Florida for three times the amount of damages that the United States/State of Florida sustained, costs of the action and a penalty of not less than $5,500 and not more than $11,000 for each false claim. The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of Florida as follows:

      a.     that the United States/State of Florida be awarded damages in the amount of three times the damages sustained by the United States/State of Florida because of the false claims alleged within this First Amended Complaint;

b.    that civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States/State of Florida and/or its grantees;

c.    that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.    that the Court grant permanent injunctive relief to prevent any recurrence of the Florida False Claims Act for which redress is sought in this First Amended Complaint;

e.    that the Relator be awarded the maximum amount allowed to her pursuant to the Florida False Claims Act; and

f.    that this Court award such other and further relief as it deems proper.

## COUNT XIV:

### Violation of State Law:  Georgia False Medicaid Claims Act

429.  Relator, on behalf of herself and the State of Georgia, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

430.  Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

431.  Medicaid is jointly funded by the federal and state governments.

432.  Defendant submitted or caused to be submitted claims to the Georgia Medicaid system and/or other government-funded system for payment or approval.

433.  Pursuant to the Georgia False Medicaid Claims Act, codified at GA. STAT. §§ 49-4-168, *et seq.*, Defendant are liable to the United States/State of Georgia for three times the amount of damages that the United States/State of

99

1  Georgia sustained, costs of the action and a penalty of not less than $5,500 and not
2  more than $11,000 for each false claim. The highest possible penalties are
3  appropriate in this case in light of the Defendant's actual knowledge. The highest
4  possible penalties are also appropriate in this case to send a message to
5  Defendant's industry that they must abide by federal and state laws.

6      WHEREFORE, Relator respectfully request that the Court enter judgment
7  against Defendant and in favor of the United States/State of Georgia as follows:

8      a.   that the United States/State of Georgia be awarded damages in
9           the amount of three times the damages sustained by the United
10          States/State of Georgia because of the false claims alleged
11          within this First Amended Complaint;

12     b.   that civil penalties of $11,000 for each and every false claim
13          that Defendant presented to the United States/State of Georgia
14          and/or its grantees;

15     c.   that pre- and post-judgment interest be awarded along with
16          reasonable attorneys' fees, costs, and expenses that Relator
17          necessarily incurred in bringing and pressing this case;

18     d.   that the Court grant permanent injunctive relief to prevent any
19          recurrence of the Georgia False Medicaid Claims Act for which
20          redress is sought in this First Amended Complaint;

21     e.   that the Relator be awarded the maximum amount allowed to
22          her pursuant to the Georgia False Medicaid Claims Act; and

23     f.   that this Court award such other and further relief as it deems
24          proper.

25
26
27
28

100

CASE NO. 11-CV-2975-WQH(JMA)

## COUNT XV:

### Violation of State Law:  Hawaii False Claims Act

434.   Relator, on behalf of herself and the State of Hawaii, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

435.   Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

436.   Medicaid is jointly funded by the federal and state governments.

437.   Defendant submitted or caused to be submitted claims to the Hawaii Medicaid system and/or other government-funded system for payment or approval.

438.   Pursuant to the Hawaii False Claims Act, codified at Haw. Rev. Stat. § 661-21, *et seq.*, Defendant are liable to the United States/State of Hawaii for three times the amount of damages that the United States/State of Hawaii sustained, costs of the action and a penalty of not less than $5,500 and not more than $11,000 for each false claim.  The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge.  The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.  The amount in controversy exceeds $500.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of Hawaii as follows:

        a.     that the United States/State of Hawaii be awarded damages in the amount of three times the damages sustained by the United States/State of Hawaii because of the false claims alleged within this  First Amended Complaint;

CASE NO. 11-CV-2975-WQH(JMA)

b.     that civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States/State of Hawaii and/or its grantees;

c.     that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.     that the Court grant permanent injunctive relief to prevent any recurrence of the Hawaii False Claims Act for which redress is sought in this First Amended Complaint;

e.     that the Relator be awarded the maximum amount allowed to her pursuant to the Hawaii False Claims Act; and

f.     that this Court award such other and further relief as it deems proper.

## COUNT XVI:

### Violation of Illinois False Claims Act

439.   Relator, on behalf of herself and the State of Illinois, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

440.   Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

441.   Medicaid is jointly funded by the federal and state governments.

442.   Defendant submitted or caused to be submitted claims to the Illinois Medicaid system and/or other government-funded system for payment or approval.

443.   Pursuant to the Illinois False Claims Act (formerly known as the Illinois Whistleblower Reward and Protection Act, codified at Il. Comp. Stat. Ann. § 175/1, *et seq.*, Defendant are liable to the United States/State of Illinois for three

102

1   times the amount of damages that the United States/State of Illinois sustained,
2   costs of the action and a penalty of not less than $5,500 and not more than $11,000
3   for each false claim. The highest possible penalties are appropriate in this case in
4   light of the Defendant's actual knowledge. The highest possible penalties are also
5   appropriate in this case to send a message to Defendant's industry that they must
6   abide by federal and state laws.

7        WHEREFORE, Relator respectfully request that the Court enter judgment
8   against Defendant and in favor of the United States/State of Illinois as follows:

9    a.   that the United States/State of Illinois be awarded damages in the
10        amount of three times the damages sustained by the United
11        States/State of Illinois because of the false claims alleged within
12        this First Amended Complaint;

13   b.   that civil penalties of $11,000 be imposed for each and every false
14        claim that Defendant presented to the United States/State of
15        Illinois and/or its grantees;

16   c.   that pre- and post-judgment interest be awarded along with
17        reasonable attorneys' fees, costs, and expenses that Relator
18        necessarily incurred in bringing and pressing this case;

19   d.   that the Court grant permanent injunctive relief to prevent any
20        recurrence of the Illinois Whistleblower Reward and Protection
21        Act for which redress is sought in this First Amended Complaint;

22   e.   that the Relator be awarded the maximum amount allowed to her
23        pursuant to the Illinois Whistleblower Reward and Protection Act;
24        and

25   f.   that this Court award such other and further relief as it deems
26        proper.

27

28

103

**CASE NO. 11-CV-2975-WQH(JMA)**

## COUNT XVII:

## Violation of State Law:  Indiana False Claims and Whistleblower Protection Act

444.   Relator, on behalf of herself and the State of Indiana, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

445.   Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

446.   Medicaid is jointly funded by the federal and state governments.

447.   Defendant submitted or caused to be submitted claims to the Indiana Medicaid system and/or other government-funded system for payment or approval.

448.   Pursuant to the Indiana False Claims and Whistleblower Protection Act, codified at Indiana Code 5-11-5.5, et seq., Defendant are liable to the United States/State of Indiana for three times the amount of damages that the state sustained, costs of the action and a penalty of not less than $5,500 for each false claim. The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of Indiana as follows:

a.   that the United States/State of Indiana be awarded damages in the amount of three times the damages sustained by the United States/State of Indiana because of the false claims alleged within this First Amended Complaint;

CASE NO. 11-CV-2975-WQH(JMA)

b.   that civil penalties of not less than $5,500 and the maximum allowable by law be imposed for each and every false claim that Defendant presented to the United States/State of Indiana and/or its grantees;

c.   that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.   that the Court grant permanent injunctive relief to prevent any recurrence of the Indiana False Claims and Whistleblower Protection Act for which redress is sought in this First Amended Complaint;

e.   that the Relator be awarded the maximum amount allowed to her pursuant to the Indiana False Claims and Whistleblower Protection Act; and

f.   that this Court award such other and further relief as it deems proper.

## COUNT XVIII:

### Violation of State Law:  Louisiana False Claims Act

449.   Relator, on behalf of herself and the State of Louisiana Medical Assistance Programs, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

450.   Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

451.   Medicaid is jointly funded by the federal and state governments.

CASE NO. 11-CV-2975-WQH(JMA)

452. Defendant submitted or caused to be submitted claims to the Louisiana Medicaid system and/or other government-funded system for payment or approval.

453. Pursuant to the Louisiana False Claims Act and/or the Louisiana Medical Assistance Programs Integrity Law, codified at La. Rev. Stat. Ann. § 46:437.1, *et seq.*, Defendant are liable to the United States/State of Louisiana Medical Assistance Programs for three times the amount of damages that the United States/State of Louisiana Medical Assistance Programs sustained, costs of the action and a penalty of not more than $11,000 for each false claim. The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of Louisiana Medical Assistance Programs as follows:

    a.    that the United States/State of Louisiana Medical Assistance Programs be awarded damages in the amount of three times the damages sustained by the United States/State of Louisiana because of the false claims alleged within this First Amended Complaint;

    b.    that civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States/State of Louisiana Medical Assistance Programs and/or its grantees;

    c.    that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

    d.    that the Court grant permanent injunctive relief to prevent any recurrence of the Louisiana False Claims Act for which redress is sought in this First Amended Complaint;

e.      that the Relator be awarded the maximum amount allowed to her pursuant to the Louisiana False Claims Act; and

f.      that this Court award such other and further relief as it deems proper.

## COUNT XIX:

## Violation of State Law: Maryland False Health Claims Act

454.   Relator, on behalf of herself and the State of Maryland, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

455.   Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

456.   Medicaid is jointly funded by the federal and state governments.

457.   Defendant submitted or caused to be submitted claims to the Maryland Medicaid system and/or other government-funded system for payment or approval.

458.   Pursuant to the Maryland False Health Claims Act, as enacted by 2010 Maryland Laws Ch. 4 (S.B. 279), Defendant are liable to the United States/State of Maryland for three times the amount of damages that the United States/Maryland sustained, costs of the action and a penalty of $11,000 for each false claim.  The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of Maryland as follows:

CASE NO. 11-CV-2975-WQH(JMA)

a.  that the United States/State of Maryland be awarded damages in the amount of three times the damages sustained by the United States/State of Maryland because of the false claims alleged within this First Amended Complaint;

b.  that civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States/State of Maryland and/or its grantees;

c.  that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.  that the Court grant permanent injunctive relief to prevent any recurrence of the Maryland False Health Claims Act for which redress is sought in this First Amended Complaint;

e.  that the Relator be awarded the maximum amount allowed to her pursuant to the Maryland False Claims Act; and

f.  that this Court award such other and further relief as it deems proper.

## COUNT XX:

### Violation of State Law:  Massachusetts False Claims Act

459.  Relator, on behalf of herself and the State of Massachusetts, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

460.  Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

461.  Medicaid is jointly funded by the federal and state governments.

CASE NO. 11-CV-2975-WQH(JMA)

462. Defendant submitted or caused to be submitted claims to the Massachusetts Medicaid system and/or other government-funded system for payment or approval.

463. Pursuant to the Massachusetts False Claims Act, codified at Mass. Ann. Laws Ch. 12, § 5(A), *et seq.*, Defendant are liable to the United States/State of Massachusetts for three times the amount of damages that the United States/State of Massachusetts sustained, costs of the action and a penalty of not less than $5,500 and not more than $11,000 for each false claim. The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of Massachusetts as follows:

a. that the United States/State of Massachusetts be awarded damages in the amount of three times the damages sustained by the United States/State of Massachusetts because of the false claims alleged within this First Amended Complaint;

b. that civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States/State of Massachusetts and/or its grantees;

c. that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d. that the Court grant permanent injunctive relief to prevent any recurrence of the Massachusetts False Claims Act for which redress is sought in this First Amended Complaint;

CASE NO. 11-CV-2975-WQH(JMA)

e.     that the Relator be awarded the maximum amount allowed to her pursuant to the Massachusetts False Claims Act; and

f.     that this Court award such other and further relief as it deems proper.

### COUNT XXI:

### Violation of State Law: Michigan Medicaid False Claims Act

464.   Relator, on behalf of herself and the State of Michigan, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

465.   Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

466.   Medicaid is jointly funded by the federal and state governments.

467.   Defendant submitted or caused to be submitted claims to the Michigan Medicaid system and/or other government-funded system for payment or approval.

468.   Pursuant to the Michigan Medicaid False Claims Act, codified at MI Public Act 337, MCL § 400.611, *et seq.*, Defendant are liable to the United States/State of Michigan for three times the amount of damages that the United States/State of Michigan sustained, costs of the action and a penalty of not less than $5,500 and not more than $11,000 for each false claim. The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of Michigan as follows:

a.     that the United States/State of Michigan be awarded damages at the highest rate allowable by law because of the false claims alleged within this First Amended Complaint;

110

b.    that civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States/State of Massachusetts and/or its grantees;

c.    that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.    that the Court grant permanent injunctive relief to prevent any recurrence of the Michigan Medicaid False Claims Act for which redress is sought in this First Amended Complaint;

e.    that the Relator be awarded the maximum amount allowed to her pursuant to the Michigan Medicaid False Claims Act; and

f.    that this Court award such other and further relief as it deems proper.

## COUNT XXII:

### Violation of State Law:  Minnesota False Claims Act

469.  Relator, on behalf of herself and the State of Minnesota, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

470.  Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

471.  Medicaid is jointly funded by the federal and state governments.

472.  Defendant submitted or caused to be submitted claims to the Minnesota Medicaid Act system and/or other government-funded system for payment or approval.

473.  Pursuant to the Minnesota False Claims Act, codified at Minn. Stat. §15C.01, *et seq.*, Defendant are liable to the United States/State of Minnesota for

three times the amount of damages that the United States/State of Minnesota sustained, costs of the action and a penalty of not less than $5,500 and not more than $11,000 for each false claim. The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of Minnesota as follows:

a.   that the United States/State of Minnesota be awarded damages in the amount of three times the damages sustained by the United States/State of Minnesota because of the false claims alleged within this First Amended Complaint;

b.   that civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States/State of Minnesota and/or its grantees;

c.   that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.   that the Court grant permanent injunctive relief to prevent any recurrence of the Minnesota False Claims Act for which redress is sought in this First Amended Complaint;

e.   that the Relator be awarded the maximum amount allowed to her pursuant to the Minnesota False Claims Act; and

f.   that this Court award such other and further relief as it deems proper.

112

**COUNT XXIII:**

**Violation of State Law:  Montana False Claims Act**

474.   Relator, on behalf of herself and the State of Montana, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

475.   Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

476.   Medicaid is jointly funded by the federal and state governments.

477.   Defendant submitted or caused to be submitted claims to the Montana Medicaid system and/or other government-funded system for payment or approval.

478.   Pursuant to the Montana False Claims Act, codified at Mont. Code Ann. § 17-8-401, *et seq.*, Defendant are liable to the United States/State of Montana for not less than two times and not more than three times the amount of damages that the United States/State of Montana sustained, costs of the action and a penalty of not more than $11,000 for each false claim.   The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of Montana as follows:

        a.     that the United States/State of Montana be awarded damages in the amount of three times the damages sustained by the United States/State of Montana because of the false claims alleged within this First Amended Complaint;

b.   that civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States/State of Montana and/or its grantees;

c.   that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.   that the Court grant permanent injunctive relief to prevent any recurrence of the Montana False Claims Act for which redress is sought in this First Amended Complaint;

e.   that the Relator be awarded the maximum amount allowed to her pursuant to the Montana False Claims Act; and

f.   that this Court award such other and further relief as it deems proper.

## COUNT XXIV:

### Violation of State Law:  Nevada Submission of False Claims to State or Local Government

479.   Relator, on behalf of herself and the State of Nevada, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

480.   Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

481.   Medicaid is jointly funded by the federal and state governments.

482.   Defendant submitted or caused to be submitted claims to the Nevada Medicaid system and/or other government-funded system for payment or approval.

483.   Pursuant to the Nevada Submission of False Claims to State or Local Government, codified at Nev. Rev. Stat. § 357.010, *et seq.*, Defendant are liable to

114

1    the United States/State of Nevada for three times the amount of damages that the

2    United States/State of Nevada sustained, costs of the action and a penalty of not

3    less than $5,500 and not more than $11,000 for each false claim. The highest

4    possible penalties are appropriate in this case in light of the Defendant's actual

5    knowledge. The highest possible penalties are also appropriate in this case to send

6    a message to Defendant's industry that they must abide by federal and state laws.

7          WHEREFORE, Relator respectfully request that the Court enter judgment

8    against Defendant and in favor of the United States/State of Nevada as follows:

9         a.    that the United States/State of Nevada be awarded damages in

10              the amount of three times the damages sustained by the United

11              States/State of Nevada because of the false claims alleged

12              within this First Amended Complaint;

13         b.    that civil penalties of $11,000 be imposed for each and every

14              false claim that Defendant presented to the United States/State

15              of Nevada and/or its grantees;

16         c.    that pre- and post-judgment interest be awarded along with

17              reasonable attorneys' fees, costs, and expenses that Relator

18              necessarily incurred in bringing and pressing this case;

19         d.    that the Court grant permanent injunctive relief to prevent any

20              recurrence of the Nevada Submission of False Claims to State

21              or Local Government for which redress is sought in this First

22              Amended Complaint;

23         e.    that the Relator be awarded the maximum amount allowed to

24              her pursuant to the Nevada Submission of False Claims to State

25              or Local Government; and

26         f.    that this Court award such other and further relief as it deems

27              proper.

28

**CASE NO. 11-CV-2975-WQH(JMA)**

## COUNT XXV:

### Violation of State Law: New Hampshire False Claims Act

484. Relator, on behalf of herself and the State of New Hampshire, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

485. Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

486. Medicaid is jointly funded by the federal and state governments.

487. Defendant submitted or caused to be submitted claims to the New Hampshire Medicaid system and/or other government-funded system for payment or approval.

488. Pursuant to the New Hampshire False Claims Act, codified at New Hampshire § 167:61-b, et seq., Defendant are liable to the United States/State of New Hampshire for three times the amount of damages that the United States/State of New Hampshire sustained, costs of the action and a penalty of not less than $5,500 and not more than $11,000 for each false claim. The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws. The amount in controversy here exceeds $5,500.

489. Pursuant to New Hampshire Revised Statutes Annotated §167:61-c, II(a), upon information and belief, Defendant, during the 12-month period immediately preceding the date the action was filed, may have received reimbursement from the Medicaid program in New Hampshire, equal to 10% or more of the Defendant's aggregate reimbursement from all state medical assistance programs governed by Title XIX of the Social Security Act.

1    WHEREFORE, Relator respectfully request that the Court enter judgment
2  against Defendant and in favor of the United States/State of New Hampshire as
3  follows:

4    a.    that the United States/State of New Hampshire be awarded
5          damages in the amount of three times the damages sustained by
6          the United States/State of New Hampshire because of the false
7          claims alleged within this First Amended Complaint;
8    b.    that civil penalties of $11,000 be imposed for each and every
9          false claim that Defendant presented to the United States/State
10         of New Hampshire and/or its grantees;
11   c.    that pre- and post-judgment interest be awarded along with
12         reasonable attorneys' fees, costs, and expenses that Relator
13         necessarily incurred in bringing and pressing this case;
14   d.    that the Court grant permanent injunctive relief to prevent any
15         recurrence of the New Hampshire False Claims Act for which
16         redress is sought in this First Amended Complaint;
17   e.    that the Relator be awarded the maximum amount allowed to
18         her pursuant to the New Hampshire False Claims Act; and
19   f.    that this Court award such other and further relief as it deems
20         proper.

21   **COUNT XXVI:**

22   **Violation of State Law:  New Jersey False Claims Act**

23   490.  Relator, on behalf of herself and the State of New Jersey, incorporates
24  by reference and re-alleges each and every preceding Paragraph of this First
25  Amended Complaint as if fully set forth herein.

26   491.  Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction
27  over Relator's state law claims because they are so related to the claims in the

28

117

1  action within such original jurisdiction that they form part of the same case or

2  controversy under Article III of the United States Constitution.

3      492.  Medicaid is jointly funded by the federal and state governments.

4      493.  Defendant submitted or caused to be submitted claims to the New

5  Jersey Medicaid system and/or other government-funded system for payment or

6  approval.

7      494.  Pursuant to the New Jersey False Claims Act, codified at NJ Stat. §

8  2A:32C-1, , *et seq.*, Defendant are liable to the United States/State of New Jersey

9  for three times the amount of damages that the United States/State of New Jersey

10 sustained, costs of the action and a penalty of not less than $5,500 and not more

11 than $11,000 for each false claim.  The highest possible penalties are appropriate in

12 this case in light of the Defendant's actual knowledge. The highest possible

13 penalties are also appropriate in this case to send a message to Defendant's

14 industry that they must abide by federal and state laws.

15     WHEREFORE, Relator respectfully request that the Court enter judgment

16 against Defendant and in favor of the United States/State of New Jersey as follows:

17     a.   that the United States/State of New Jersey be awarded damages in

18        the amount of three times the damages sustained by the United

19        States/State of New Jersey because of the false claims alleged

20        within this First Amended Complaint;

21     b.   that civil penalties of $11,000 be imposed for each and every false

22        claim that Defendant presented to the United States/State of New

23        Jersey and/or its grantees;

24     c.   that pre- and post-judgment interest be awarded along with

25        reasonable attorneys' fees, costs, and expenses that Relator

26        necessarily incurred in bringing and pressing this case;

27

28

d.  that the Court grant permanent injunctive relief to prevent any recurrence of the New Jersey False Claims Act for which redress is sought in this First Amended Complaint;

e.  that the Relator be awarded the maximum amount allowed to her pursuant to the New Jersey False Claims Act; and

f.  that this Court award such other and further relief as it deems proper.

## COUNT XXVII:

## Violation of State Law:  New Mexico Medicaid False Claims Act and New Mexico Fraud Against Taxpayers Act

495.  Relator, on behalf of herself and the State of New Mexico, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

496.  Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

497.  Medicaid is jointly funded by the federal and state governments.

498.  Defendant submitted or caused to be submitted claims to the New Mexico Medicaid system and/or other government-funded system for payment or approval.

499.  Pursuant to the New Mexico Medicaid False Claims Act, codified at N.M.S.A. 27-14-1, *et seq.*, and/or the New Mexico Fraud Against Taxpayers Act, codified at N.M.S.A. 44-9-1, *et seq.*, Defendant are liable to the United States/State of New Mexico for three times the amount of damages that the United States/state sustained, costs of the action and a civil recovery for each false claim.  The highest possible penalties are appropriate in this case in light of the Defendant's actual

119

knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of New Mexico as follows:

 a. that the United States/State of New Mexico be awarded damages in the amount of three times the damages sustained by the United States/State of New Mexico because of the false claims alleged within this First Amended Complaint;

 b. that maximum civil recoveries allowed by law for each and every false claim that Defendant presented to the United States/State of New Mexico and/or its grantees;

 c. that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

 d. that the Court grant permanent injunctive relief to prevent any recurrence of the New Mexico Medicaid False Claims Act and/or the New Mexico Fraud Against Taxpayers Act for which redress is sought in this First Amended Complaint;

 e. that the Relator be awarded the maximum amount allowed to her pursuant to the New Mexico Medicaid False Claims Act New Mexico Fraud Against Taxpayers Act; and

 f. that this Court award such other and further relief as it deems proper.

## **COUNT XXVIII:**

### **Violation of State Law:  New York False Claims Act**

500.   Relator, on behalf of herself and the State of New York, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

501.   Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

502.   Medicaid is jointly funded by the federal and state governments.

503.   Defendant submitted or caused to be submitted claims to the New York Medicaid system and/or other government-funded system for payment or approval.

504.   Pursuant to the New York False Claims Act, codified at NY State. Fin. Law, ch. 13 §§ 187-194, Defendant are liable to the United States/State of New York for three times the amount of damages that the United States/State of New York sustained, costs of the action and a penalty of not less than $6,000 and not more than $12,000 for each false claim.  The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge.  The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.  Defendant each has an income over $1 million and the harm to the State of New York exceeds $350,000.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of New York as follows:

     a.     that the United States/State of New York be awarded damages in the amount of three times the damages sustained by the United

121

States/State of New York because of the false claims alleged within this First Amended Complaint;

b.   that civil penalties of $12,000 be imposed for each and every false claim that Defendant presented to the United States/State of New York and/or its grantees;

c.   that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.   that the Court grant permanent injunctive relief to prevent any recurrence of the New York State False Claims Act for which redress is sought in this First Amended Complaint;

e.   that the Relator be awarded the maximum amount allowed to her pursuant to the New York State False Claims Act; and

f.   that this Court award such other and further relief as it deems proper.

## COUNT XXIX:

## Violation of State Law:  North Carolina False Claims Act

505.   Relator, on behalf of herself and the State of North Carolina, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

506.   Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

507.   Medicaid is jointly funded by the federal and state governments.

508.   Defendant submitted or caused to be submitted claims to the North Carolina Medicaid system and/or other government-funded system for payment or approval.

509.   Pursuant to the North Carolina False Claims Act, S.L. 2009-554/HB 1135, Defendant are liable to the United States/State of North Carolina for three times the amount of damages that the United States/State of North Carolina sustained, costs of the action and a penalty of not less than $5,500 and not more than $11,000 for each false claim.  The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge.   The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of North Carolina as follows:

a.   that the United States/State of North Carolina be awarded damages in the amount of three times the damages sustained by the United States/State of North Carolina because of the false claims alleged within this First Amended Complaint;

b.   that civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States/State of North Carolina and/or its grantees;

c.   that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.   that the Court grant permanent injunctive relief to prevent any recurrence of the North Carolina False Claims Act for which redress is sought in this First Amended Complaint;

e.   that the Relator be awarded the maximum amount allowed to her pursuant to the North Carolina False Claims Act; and

f.   that this Court award such other and further relief as it deems proper.

CASE NO. 11-CV-2975-WQH(JMA)

## COUNT XXX:

### Violation of State Law:  Oklahoma Medicaid False Claims Act

510.   Relator, on behalf of herself and the State of Oklahoma, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

511.   Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

512.   Medicaid is jointly funded by the federal and state governments.

513.   Defendant submitted or caused to be submitted claims to the Oklahoma Medicaid system and/or other government-funded system for payment or approval.

514.   Pursuant to the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053, *et seq.*, Defendant are liable to the United States/State of Oklahoma for three times the amount of damages that the United States/State of Oklahoma sustained, costs of the action and a penalty of not less than $5,500 and not more than $11,000 for each false claim.  The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge.   The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of Oklahoma as follows:

        a.     that the United States/State of Oklahoma be awarded damages in the amount of three times the damages sustained by the United States/State of Oklahoma because of the false claims alleged within this First Amended Complaint;

124

CASE NO. 11-CV-2975-WQH(JMA)

b.   that civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States/State of Oklahoma and/or its grantees;

c.   that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.   that the Court grant permanent injunctive relief to prevent any recurrence of the Oklahoma Medicaid False Claims Act for which redress is sought in this First Amended Complaint;

e.   that the Relator be awarded the maximum amount allowed to her pursuant to the Oklahoma Medicaid False Claims Act; and

f.   that this Court award such other and further relief as it deems proper.

## COUNT XXXI:

### Violation of State Law: Rhode Island State False Claims Act

515.   Relator, on behalf of herself and the State of Rhode Island, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

516.   Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

517.   Medicaid is jointly funded by the federal and state governments.

518.   Defendant submitted or caused to be submitted claims to the Rhode Island Medicaid system and/or other government-funded system for payment or approval.

519.   Pursuant to the Rhode Island State False Claims Act, Defendant are liable to the United States/State of Rhode Island for three times the amount of

125

1   damages that the United States/State of Rhode Island sustained, costs of the action
2   and a penalty of not less than $5,500 and not more than $11,000 for each false
3   claim.  The highest possible penalties are appropriate in this case in light of the
4   Defendant's actual knowledge.  The highest possible penalties are also appropriate
5   in this case to send a message to Defendant's industry that they must abide by
6   federal and state laws.

7          WHEREFORE, Relator respectfully request that the Court enter judgment
8   against Defendant and in favor of the United States/State of Rhode Island as
9   follows:

10          a.   that the United States/State of Rhode Island be awarded damages
11               in the amount of three times the damages sustained by the United
12               States/State of Rhode Island because of the false claims alleged
13               within this First Amended Complaint;

14          b.   that civil penalties of $11,000 be imposed for each and every false
15               claim that Defendant presented to the United States/State of Rhode
16               Island and/or its grantees;

17          c.   that pre- and post-judgment interest be awarded along with
18               reasonable attorneys' fees, costs, and expenses that Relator
19               necessarily incurred in bringing and pressing this case;

20          d.   that the Court grant permanent injunctive relief to prevent any
21               recurrence of the Rhode Island State False Claims Act for which
22               redress is sought in this First Amended Complaint;

23          e.   that the Relator be awarded the maximum amount allowed to her
24               pursuant to the Rhode Island State False Claims Act; and

25          f.   that this Court award such other and further relief as it deems
26               proper.

27

28

CASE NO. 11-CV-2975-WQH(JMA)

## COUNT XXXII:

### Violation of State Law:  Tennessee Medicaid False Claims Act and False Claims Act

520.   Relator, on behalf of herself and the State of Tennessee, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

521.   Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

522.   Medicaid is jointly funded by the federal and state governments.

523.   Defendant submitted or caused to be submitted claims to the Tennessee Medicaid system and/or other government-funded system for payment or approval.

524.   Pursuant to the Tennessee Medicaid False Claims Act, codified at Tenn. Code Ann., § 71-5-181, *et seq.*, and/or the Tennessee False Claims Act, codified atTenn. Code Ann., § 4-18-101, *et seq.*, Defendant are liable to the United States/State of Tennessee for three times the amount of damages that the United States/State of Tennessee sustained, costs of the action and a penalty of not less than $5,500 and not more than $25,500 for each false claim.  The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.  The amount in controversy exceeds $500.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of Tennessee as follows:

a.     that the United States/State of Tennessee be awarded damages in the amount of three times the damages sustained by the United

127

States/State of Tennessee because of the false claims alleged within this First Amended Complaint;

b.   that civil penalties of $25,500 be imposed for each and every false claim that Defendant presented to the United States/State of Tennessee and/or its grantees;

c.   that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.   that the Court grant permanent injunctive relief to prevent any recurrence of the Tennessee Medicaid False Claims Act and/or the Tennessee False Claims Act for which redress is sought in this First Amended Complaint;

e.   that the Relator be awarded the maximum amount allowed to her pursuant to the Tennessee Medicaid False Claims Act and/or the Tennessee False Claims Act; and

f.   that this Court award such other and further relief as it deems proper.

## COUNT XXXIII:

### Violation of State Law: Texas Medicaid Fraud Prevention Act

525.   Relator, on behalf of herself and the State of Texas, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

526.   Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

527.   Medicaid is jointly funded by the federal and state governments.

528.   Defendant submitted or caused to be submitted claims to the Texas Medicaid system and/or other government-funded system for payment or approval.

128

529. Pursuant to the Texas Medicaid Fraud Prevention Act, codified at Tex. Hum. Res. Code, § 36.001, *et seq.*, Defendant are liable to the United States/State of Texas for two times the amount of damages that the United States/State of Texas sustained, costs of the action and a penalty of not less than $5,500 and not more than $11,000 for each false claim. The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of Texas as follows:

a.  that the United States/State of Texas be awarded damages in the amount of two times the damages sustained by the United States/State of Texas because of the false claims alleged within this First Amended Complaint;

b.  that civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States/State of Texas and/or its grantees;

c.  that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.  that the Court grant permanent injunctive relief to prevent any recurrence of the Texas Medicaid Fraud Prevention Act for which redress is sought in this First Amended Complaint;

e.  that the Relator be awarded the maximum amount allowed to her pursuant to the Texas Medicaid Fraud Prevention Act; and

f.  that this Court award such other and further relief as it deems proper.

## COUNT XXXIV:

## Violation of State Law:  Virginia Fraud Against Taxpayers Act

530.   Relator, on behalf of herself and the State of Virginia, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

531.   Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

532.   Medicaid is jointly funded by the federal and state governments.

533.   Defendant submitted or caused to be submitted claims to the Virginia Medicaid system and/or other government-funded system for payment or approval.

534.   Pursuant to the Virginia Fraud Against Taxpayers Act, codified at Vir. Stat. Ann., § 8.01-216, *et seq.*, Defendant are liable to the United States/State of Virginia for three times the amount of damages that the United States/State of Virginia sustained, costs of the action and a penalty of not less than $5,500 and not more than $11,000 for each false claim.   The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge.   The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of Virginia as follows:

        a.      that the United States/State of Virginia be awarded damages in the amount of three times the damages sustained by the United States/State of Virginia because of the false claims alleged within this First Amended Complaint;

CASE NO. 11-CV-2975-WQH(JMA)

b. that civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States/State of Virginia and/or its grantees;

c. that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d. that the Court grant permanent injunctive relief to prevent any recurrence of the Virginia Fraud Against Taxpayers Act for which redress is sought in this First Amended Complaint;

e. that the Relator be awarded the maximum amount allowed to her pursuant to the Virginia Fraud Against Taxpayers Act; and

f. that this Court award such other and further relief as it deems proper.

## COUNT XXXV:

### Violation of State Law:  Wisconsin False Claims for Medical Assistance Law

535. Relator, on behalf of herself and the State of Wisconsin, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

536. Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

537. Medicaid is jointly funded by the federal and state governments.

538. Defendant submitted or caused to be submitted claims to the Wisconsin Medicaid system and/or other government-funded system for payment or approval.

539. Pursuant to the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931, *et seq.*, Defendant are liable to the United States/State of

Wisconsin for three times the amount of damages that the United States/State of Wisconsin sustained, costs of the action and a penalty of not less than $5,500 and not more than $11,000 for each false claim. The highest possible penalties are appropriate in this case in light of the Defendant's actual knowledge. The highest possible penalties are also appropriate in this case to send a message to Defendant's industry that they must abide by federal and state laws.

WHEREFORE, Relator respectfully request that the Court enter judgment against Defendant and in favor of the United States/State of Wisconsin as follows:

    a.    that the United States/State of Wisconsin be awarded damages in the amount of three times the damages sustained by the United States/State of Wisconsin because of the false claims alleged within this First Amended Complaint;

    b.    that civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States/State of Wisconsin and/or its grantees;

    c.    that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

    d.    that the Court grant permanent injunctive relief to prevent any recurrence of the Wisconsin False Claims for Medical Assistance Law for which redress is sought in this First Amended Complaint;

    e.    that the Relator be awarded the maximum amount allowed to her pursuant to the Wisconsin False Claims for Medical Assistance Law; and

    f.    that this Court award such other and further relief as it deems proper.

CASE NO. 11-CV-2975-WQH(JMA)

## COUNT XXXVI:

## Common Fund

540. Relator, on behalf of herself, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

541. Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

542. Medicaid is jointly funded by the federal and state governments.

543. Defendant submitted or caused to be submitted claims to state Medicaid programs in all fifty states and the District of Columbia.

544. Relator's efforts have or will create, discover, increase or preserve a fund to which others also have a claim.

545. Relator is entitled to recover from the fund.

546. States will receive a benefit from the common fund that Relator has or will create.

547. If any state that does not provide for a statutory fee to Relator is allowed to obtain the benefit of this case without contributing to its costs, that state without a statutory fee to Relator will be unjustly enriched at the expense of Relator.

548. Any state that does not provide for a statutory fee to Relator and that benefits from the fund will be easily identifiable.

WHEREFORE, Relator respectfully requests that the Court enter judgment in her favor for all relief as the Court deems proper in law and equity including the costs of the litigation and reasonable attorneys' fees.

133

## COUNT XXXVII:

### Common Law *Qui Tam*

549.  Relator, on behalf of herself, incorporates by reference and re-alleges each and every preceding Paragraph of this First Amended Complaint as if fully set forth herein.

550.  Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Relator's state law claims because they are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

551.  Medicaid is jointly funded by the federal and state governments.

552.  Defendant submitted or caused to be submitted claims to the state Medicaid programs in all fifty states and the District of Columbia.

553.  Relator's efforts have or will create, discover, increase or preserve a fund in which the state governments will share.

554.  The term *qui tam* is Latin for the phrase "he who brings an action on behalf of the king as well as for himself."

555.  Pursuant to the common law of *qui tam*, Relator is entitled to recover a portion of the fund that is shared by all fifty states and the District of Columbia (including states that do not provide a statutory fee to Relator) as a result of Relator's efforts.

WHEREFORE, Relator respectfully requests that the Court enter judgment in her favor for a portion of the fund in which the governmental entities will share, costs of the litigation, including reasonable attorneys' fees, and all other and further relief as the Court deems proper in law and equity.

### Demand for Jury Trial/Designation of Place of Trial

Relator, on behalf of the United States and the States named herein, and on behalf of herself, hereby demands a trial by jury on all counts and allegations of wrongful conduct alleged in this First Amended Complaint in the United States

134

1   District Court for the District of California, Southern Division, San Diego,

2   California.

4                                        Respectfully submitted,

6                                        The Emge Firm, LLP CA#161105
                                         501 W. Broadway, Suite 1760
7                                        San Diego, CA 92101
                                         (619) 595-1400
8                                        Fax (619)595-1480
                                         derek@emgelawfirm.com
9                                        www.emgelawfirm.com

10                                       and

11                                       Carrie M. Brous KS # 18157
                                         Tammy L. Horn KS # 15418
12                                       Brous Horn LLC
                                         10313 West 140th Street
13                                       The Carriage House
                                         Overland Park, KS  66221
14                                       (913) 897-7877
                                         Fax (913) 982-2515
15                                       thorn@broushorn.com
                                         cbrous@broushorn.com
16                                       www.broushorn.com

18                                       ATTORNEYS FOR RELATOR

                                         135

## Certificate of Service

I hereby certify that a copy of the foregoing filed under seal with the Court is being served on this 14th day of September, 2015 on the following:

**VIA CERTIFIED MAIL**
Eric H. Holder, Jr., Attorney General of the United States
Attorneys, Civil Division
U.S. Department of Justice, Civil Fraud Division
950 Pennsylvania Ave., NW
Washington, D.C. 20530-0001

(Pursuant to 31 USC § 3732(c) (as amended by the Fraud Enforcement and Recovery Act of 2009 (123 Stat 1617 (May 20, 2009))

Attorneys General for the State of Arkansas, State of California, State of Colorado, State of Connecticut, State of Delaware, District of Columbia, State of Florida, State of Georgia, State of Hawaii, State of Illinois, State of Indiana, State of Louisiana Medical Assistance Programs, State of Maryland, State of Massachusetts, State of Michigan, State of Minnesota, State of Montana, State of Nevada, State of New Hampshire, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of Oklahoma, State of Rhode Island, State of Tennessee, State of Texas, State of Virginia and State of Wisconsin

(Pursuant to the respective state *qui tam* statutes in Counts XI-XXXVII)

And a courtesy copy was sent to the following:

**VIA U.S. MAIL**
Laura E. Duffy, United States Attorney General
880 Front Street, Room 6293
San Diego, CA 92101

**VIA U.S. MAIL**
Jeffrey Wertkin, Assistant Attorney General
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044

**VIA U.S. MAIL**
Tim Fisher and Shelly Martin, Assistant Attorneys General
State of Maryland
200 St. Paul Place
Baltimore, MD 21202
(members of NAMFUCU)

Attorney for Relator

**CASE NO. 11-CV-2975-WQH(JMA)**